## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| LAUREN CUNNINGHAM, individually and as a representative of a class of participants and beneficiaries in and on behalf of the USI 401(k) PLAN, | ) ) ) ) ) | Civil Action No. 7:21-cv-01819 |
| Plaintiff, | ) ) | |
| v. | ) ) | CLASS ACTION |
| USI INSURANCE SERVICES, LLC; | ) ) | |
| and | ) ) | |
| BOARD OF DIRECTORS OF USI INSURANCE SERVICES, LLC; | ) ) ) | |
| and | ) ) | |
| USI 401(k) PLAN COMMITTEE; | ) ) | |
| and | ) ) | |
| JOHN AND JANE DOES 1-30, | ) ) | |
| Defendants. | ) ) ) ) ) ) | |

## COMPLAINT

Plaintiff Lauren Cunningham ("Plaintiff"), on behalf of the USI 401(k) Plan (the "Plan"), herself as a Plan participant, and all others similarly situated, alleges as follows:

## I.    NATURE OF ACTION AND INTRODUCTION

1.    This is a class action brought pursuant to the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461 ("ERISA") for the benefit of the Plan and its participants. The action asserts claims for breaches of fiduciary duties and other violations of 29 U.S.C. §1132(a)(2) and

(3), from 2015 through to the present (the "Class Period"), against the Plan's fiduciaries, which include: USI Insurance Services, LLC; the USI 401(k) Plan Committee; the Board of Directors of USI Insurance Services, LLC; and John and Jane Does 1-30 (collectively, "Defendants").

2.      Every year, millions of employees entrust their retirement savings to plans established under ERISA. ERISA plans are supposed to be protected by their fiduciaries, who are obligated to act loyally and prudently to protect plan participants and their hard-earned retirement dollars.

3.      As of September 2020, Americans had approximately $9.3 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $33.1 Trillion in Third Quarter 2020* (Dec. 16, 2020), https://www.ici.org/research/stats/retirement/ret_20_q3. Defined contribution plans have largely replaced defined benefit plans—or pension plans—that were predominant in previous generations. *See* James McWhinney, *The Demise of the Defined-Benefit Plan*, Investopedia (Updated Nov. 16, 2020).[1]  Today, only 17% of private sector employees have access to a defined-benefit plan, while 64% have access to a defined-contribution plan.  *Id*.

4.      The essential remedial purpose of ERISA is to protect the beneficiaries of private retirement plans. ERISA fiduciaries have a continuing duty to evaluate fees and expenses being assessed to a plan in order to make sure those charges are reasonable and prudent.

5.      Failures by ERISA fiduciaries to monitor costs for reasonableness have stark financial consequences for retirees. Every extra level of expenses imposed upon plan participants compounds over time and reduces the value of participants' investments available upon retirement.

6.      The potential for disloyalty and imprudence is much greater in defined contribution

---

[1] Available at https://www.investopedia.com/articles/retirement/06/demiseofdbplan.asp (last visited Mar. 2, 2021)

plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees and investment underperformance. Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments. But in a defined contribution plan, participants' benefits are limited to the value of their own investment accounts, which is determined by the market performance of contributions, less expenses. Thus, in a defined contribution plan, risks related to high fees and poorly performing investments are borne by the employee.

7.       For plan sponsors that are companies which also provide retirement plan services ("RPS") the potential for imprudent and disloyal conduct is especially high in light of the potential self-serving relationship whereby the plan sponsor can profit from providing RPS to the plan.  This is precisely the situation for the USI 401(k) Plan and, as a result, there is an enhanced danger of the absence of a loyal, non-conflicted, objective, and prudent fiduciary process.

8.       The table below illustrates how fees impact retirement accounts over time.[2] The table illustrates that when an employee invests $100,000 over 20 years with an assumed 4% annual rate of return and annual fees of 1.00%, the account balance in 20 years will be $180,000. This balance is $30,000, less than the same investment where annual fees are only 0.25%, which would result in a balance of $210,000. This difference of over 14 percent is substantial. In fact, the impact of excessive fees on defined contribution participants is even more substantial given that during most of the past three decades the returns of defined contribution participants have averaged almost double (7%) the 4% in the below SEC example (*see, e.g.*, Net Weighted Geometric Rate of Return

---

[2] *See* https://www.sec.gov/files/ib_mutualfundfees.pdf (last visited Mar. 2, 2021).

of Defined Contribution Plans from 1990-2012 as calculated by the Center for Retirement

Research, Investment Returns: Defined Benefit vs. Defined Contribution Plans, December 2015,

Number 15-21, p. 3, Table 4. Center for Retirement Research).



9.      Indeed, one court recently noted:

> Expenses, such as management or administrative fees, can sometimes significantly
> reduce the value of an account in a defined-contribution plan . . . by decreasing its
> immediate value, and by depriving the participant of the prospective value of funds
> that would have continued to grow if not taken out in fees.[3]

10.     The Defendants are ERISA fiduciaries pursuant to 29 U.S.C. § 1002(21)(A),

because they exercise discretionary authority or discretionary control over the Plan, which

Defendants sponsor and administer.

11.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as

Plan fiduciaries, pursuant to 29 U.S.C. § 1104(a). ERISA's fiduciary duties are among "the highest

known to the law." *Donovan v. Bierwirth*, 680 F. 2d 263, 272 n.8 (2d Cir. 1982). Fiduciaries must

---

[3] *Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2565 (2020)
(internal citation and quotations omitted).

act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).  As fiduciaries to the Plan, Defendants were and are obligated to prudently ensure that Plan fees and expenses are reasonable.

12.     Defined contribution retirement plans are often categorized in terms of the value of the assets in the plan. For example, plans with less than $5 million in assets are often classified as "micro" plans, plans with between $5 and $50 million in assets are considered "small" plans, plans with assets between $50 and $200 million in assets are considered "mid" plans, and plans with greater than $200 million in assets are considered "large" plans.

13.     With 9,867 participants holding account balances and nearly $848 million in net assets as of December 31, 2019, based on publicly available Form 5500 data, the Plan is larger than 99.82% of defined contribution plans in terms of participants, and larger than 99.81% in terms of assets, and is thus considered a "large" retirement plan.

14.     The marketplace for RPS is well-established and highly competitive. Having had between $400-$850 million in assets, the Plan was a "large" plan since at least 2015 and, as a result, had tremendous bargaining power to demand low-cost administrative and investment management services.

15.     Prudent plan fiduciaries continuously monitor both (1) investment fees against applicable benchmarks and peer groups, and (2) the market for reasonable RPS fees, in order to identify objectively unreasonable and unjustifiable fees.

16.     But instead of leveraging the Plan's substantial bargaining power to benefit Plan participants and beneficiaries, Defendants caused the Plan to imprudently pay unreasonable and excessive fees for RPS in relation to the services being provided to the Plan.

17.     Furthermore, throughout the Class Period, Defendants placed their interests ahead of the interests of Plaintiff and other Plan participants and beneficiaries by using a subsidiary of USI, USI Consulting Group ("USICG"), to provide the RPS to the Plan.  The decision to use USI's in-house consulting group cannot be justified in light of the excessive and unreasonable amount of RPS fees paid to USICG. This decision was disloyal to the Plan participants because it elevated Defendants' financial interests above the interests of Plan participants.

18.     Upon information and belief, during the Class Period, Defendants breached their duties owed to the Plan, to Plaintiff, and all other Plan participants by:

      a.     Imprudently failing to monitor the RPS fees paid by the Plan to ensure that they were reasonable and, as a result, authorizing the Plan to pay objectively unreasonable and excessive RPS fees, relative to the RPS received;

      b.     Imprudently failing to understand the methodology by which fee payments such as revenue sharing are paid to RPS providers;

      c.     Imprudently failing to take standard and customary actions to understand the market for RPS in order to monitor for reasonableness the RPS fees paid by the Plan in relation to the RPS received; and

      d.     Disloyally retaining USI's own RPS unit, USICG, to perform RPS at fees in excess of reasonable fees and at Plan participants' expense, and to benefit USI as opposed to Plan participants.

19.     The objectively unreasonable RPS fees charged to the Plan by Defendants cannot be justified. During the Class Period, the Plan paid between $81 and $154 per participant annually for RPS. During the Class Period, reasonable RPS fees for a plan of this size would have averaged $42 per participant annually.

20.     Defendants' failures to monitor RPS fees and ensure their reasonableness breached the fiduciary duties they owed to Plaintiff, Plan participants, and beneficiaries. Prudent fiduciaries of 401(k) plans continuously monitor the market for RPS to ensure the fees paid by the plan are reasonable. Defendants did not engage in prudent decision-making processes, but decided instead to install USI's own in-house consulting group to provide RPS to the Plan in order to benefit themselves. There is no other explanation for why the Plan paid objectively unreasonable fees for RPS.

21.     Plaintiff was injured by the Defendants' actions because Defendants permitted all Plan participants to be charged excessive RPS fees, which reduced Plaintiff's and other Plan participants' account balances and caused them significantly diminished investment returns.

22.     To remedy Defendants' fiduciary breaches, Plaintiff, individually and as a representative of a class of participants and beneficiaries in the Plan, brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. § 1109(a) to restore to the Plan all losses resulting from each breach of fiduciary duty, as alleged in more detail herein. In addition, Plaintiff seeks such other equitable or remedial relief for the Plan as the Court may deem appropriate.

23.     The allegations in this Complaint are based upon information and belief and an investigation by undersigned counsel, including, but not limited to, review of Plan filings with the United States Department of Labor ("DOL"), other publicly available documents, and other analytical investment data. Defendants have possession of additional material information relating to the claims herein, and Plaintiff reserves the right to amend this Complaint as those materials become available in the course of this litigation.

## II.    JURISDICTION AND VENUE

24.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331, which provide for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. §§ 1001 *et seq*.

25.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, have significant contacts within this District, and because ERISA provides for nationwide service of process.

26.     This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) because the Plan is administered in this District; the Plan is deemed to reside in this District; some or all of the ERISA violations alleged herein took place in this District; and the Plan can be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.   PARTIES

### A.    Plaintiff

27.     Plaintiff Lauren Cunningham ("Plaintiff") is a resident of Sandy Springs, Georgia. Plaintiff is a current "participant" in the Plan, as that term is defined under 29 U.S.C §1002(7), because she has a vested account balance in the Plan and her beneficiaries are or may become eligible to receive benefits under the Plan. Plaintiff participates in the Plan through her employer, USI Insurance Services, LLC. Plaintiff was and is a participant in the Plan from 2017 through the present. During the Class Period, Plaintiff paid excessive RPS fees directly and indirectly through revenue sharing.

28.     Plaintiff has Article III standing to bring this action because she suffered an actual

injury to her own individual Plan account in which she is still a participant, that injury is fairly traceable to Defendants' breaches of fiduciary duties in violation of ERISA, and the harm is likely to be redressed by a favorable judgment.

29.     The Plan also suffered harm caused by Defendants' fiduciary breaches and remains exposed to harm and continued future losses. The Plan is the victim of a fiduciary breach and will be the recipient of any recovery. Plaintiff's claims are brought in a representative capacity on behalf of the Plan as a whole and seek remedies under 29 U.S.C. § 1109 to protect the entire Plan. Plaintiff and all participants and beneficiaries in the Plan suffered ongoing financial harm as a result of Defendants' continued disloyal, imprudent, and unreasonable decisions respecting Plan fees and services. Those injuries may be redressed by a judgment of this Court in favor of Plaintiff.

30.     Plaintiff did not have knowledge of all material facts (including, among other things, the RPS fees and total cost comparisons to similarly sized plans) necessary to understand that Defendants breached (and continue to breach) their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed. Plaintiff lacked actual knowledge of Defendants' disloyalty in selecting USICG as the Plan's RPS provider and of reasonable fee levels and prudent fee alternatives available to the Plan.  Further, Plaintiff did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting, monitoring, evaluating, and removing Plan investments; and Defendants' processes for selecting and monitoring the Plan's RPS provider, i.e., USICG). For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above and below.

B.      **Defendants**

31.      Defendant USI Insurance Services, LLC ("USI")[4] is a company with a principal place of business located at 100 Summit Lake Drive, Suite 400, Valhalla, New York 10595. Per the Plan's Forms 5500, USI is a Plan Administrator under 29 U.S.C. § 1002(16)(A)(i) and the Plan Sponsor under 29 U.S.C. § 1002(16)(B). As a Plan Administrator, USI is a fiduciary responsible for day-to-day administration and operation of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A). USI has responsibility and discretionary authority to control the operation, management, and administration of the Plan in accordance with 29 U.S.C. § 1102(a), with all powers necessary to enable it to carry out such responsibilities properly, including the selection and compensation of the providers of RPS to the Plan. USI acted through its officers, directors, and the other Defendants to perform Plan-related fiduciary functions in the course and scope of their business. USI appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty, to monitor and supervise those appointees.

32.      Defendant Board of Directors of USI Insurance Services, LLC ("Board of Directors") is, on information and belief, located at 100 Summit Lake Drive, Suite 400, Valhalla, New York 10595. Per the Plan's publicly available Forms 5500, and on information and belief, the Board of Directors has authority to manage and control the administration and operation of the Plan. For example, the Plan's Forms 5500, Notes to Financial Statements, clarify that the Board of Directors appoints the USI 401(k) Plan Committee and has the discretion to terminate the Plan. On information and belief, the Board of Directors and its members, in their individual capacities, exercised authority and control over Plan management and Plan assets since at least 2015, and thus are Plan fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A).

---

[4] In this Complaint, "USI" refers to the named Defendant USI and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

33.     Defendant USI 401(k) Plan Committee ("Committee") is, on information and belief, located at 100 Summit Lake Drive, Suite 400, Valhalla, New York 10595. The Committee and its members, in their individual capacities, are fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A). According to the Plan's Forms 5500, Notes to Financial Statements, the Committee is also designated as Plan Administrator under 29 U.S.C. § 1002(16)(A)(i). As a Plan Administrator, the Committee is a fiduciary responsible for day-to-day administration and operation of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A). The Committee has responsibility and discretionary authority to control the operation, management, and administration of the Plan in accordance with 29 U.S.C. § 1102(a), with all powers necessary to enable it to carry out such responsibilities properly, including the selection and compensation of the providers of RPS to the Plan. The Committee acted through its individual committee members and the other Defendants to perform Plan-related fiduciary functions in the course and scope of their business. On information and belief, the Committee appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty, to monitor and supervise those appointees.

34.     Defendants John and Jane Does 1-30 are unknown individuals comprising individual members of Defendants the Board of Directors and the Committee; any officers, directors, or employees of Defendant USI; or other individuals or entities who are or were fiduciaries to the Plan, within the meaning of 29 U.S.C. § 1002(21)(A), during the Class Period. Plaintiff reserves the right to seek leave to join these currently unknown individuals into the instant action once their identities are ascertained.

35.     All Defendants are Plan fiduciaries because they have exercised and continue to exercise discretionary authority or discretionary control respecting the management of the Plan and the management and disposition of its assets, and have discretionary authority or discretionary

responsibility in the administration of the Plan. 29 U.S.C. § 1002(21)(A).

### IV.    THE USI 401(k) PLAN

36.    The name of the Plan is the USI 401(k) Plan. The Plan's Employer Identification Number (EIN) is 13-3771734 and the Plan has been assigned the three-digit plan number 001.

37.    The Plan is subject to ERISA and is, on information and belief, established and maintained under written Plan documents in accordance with 29 U.S.C. § 1102(a)(1).

38.    The Plan is a defined contribution retirement plan, pursuant to 29 U.S.C. §§ 1002(2)(A) and 1002(34). In defined contribution plans, the value of a participant's retirement account is determined solely by, and thus is limited to, employee and employer contributions plus the amount gained through investment in the options made available in the plan, less expenses. Employees contribute a percentage of their pre-tax earnings to the Plan through an individual account, which is invested in investment options chosen from an investment lineup selected by the Plan's fiduciaries. The employer may choose to make contributions to the employee accounts.

39.    The Plan provides the primary source of retirement income for many employees of USI. The ultimate retirement benefit provided to Plan participants depends on the performance of investment options chosen for the Plan by Defendants, net of fees and expenses. Participants have the right to direct the investment of their account dollars to the available investment options chosen by the Plan fiduciaries.

40.    The majority of fees assessed to Plan participants are attributable to two general categories of services: RPS fees (primarily comprised of RPS) and investment management fees. These expenses significantly reduce the value of an account in the Plan. The Plan fiduciaries are required to control Plan expenses, including those associated with the service providers selected and hired to administer the Plan (e.g., recordkeepers). The Plan fiduciaries are also responsible for

negotiating and approving fees paid to the Plan service providers, whether directly or indirectly paid.

41.     Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, excessive fees can dramatically reduce the amount of benefits available when the participant is ready to retire. Over time, even small differences in fees compound and can result in vast differences in the amount of savings available at retirement. As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 575 U.S. 523, 135 S. Ct. 1823, 1826 (2015).

42.     The impact of excessive fees on the Plan's employees' and retirees' retirement assets is dramatic. The DOL has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career.[5]

43.     Plan participants typically have little appreciation of the fees being assessed to their accounts. Indeed, according to a 2017 survey conducted by TD Ameritrade, only 27% of investors believed they knew how much they were paying in fees as participants in 401(k) plans, and 37% were unaware that they paid 401(k) fees at all.[6] It is incumbent upon plan fiduciaries to look out for plan participants, protect their retirement dollars, and make sure fees remain reasonable.

---

[5] United States Dep't of Labor, *A Look at 401(k) Plan Fees*, at 1-2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited Mar. 2, 2021).
[6] *See* https://s2.q4cdn.com/437609071/files/doc_news/research/2018/Investor-Sentiment-Infographic-401k-fees.pdf (last visited Mar. 2, 2021).

## V.     FACTUAL BACKGROUND

### A.     OVERVIEW OF RETIREMENT PLAN SERVICES IN DEFINED CONTRIBUTION PLANS

44.     In recent decades, the defined contribution plan has become the most common type of employer-sponsored retirement plan. The assets of a defined contribution plan are held by a trustee in a single trust. The plan allocates the trust assets among plan participants through an RPS provider (often referred to generically as a "recordkeeper") that tracks each participant's account, which consists of his/her share of plan investments and returns.

45.     Fiduciaries of virtually all "large" defined contribution plans hire one RPS provider to provide the essential Recordkeeping & Administrative ("RK&A") services for a plan. RK&A services are necessary for defined contribution plans, and the services often include, but are not limited to, maintaining plan records, tracking participant account balances and investment elections, providing transaction processing, providing call center support and investment education and guidance, providing participant communications, and providing trust and custodial services. RPS includes the RK&A services as well as fees for other services such as individual transactions and/or services that are utilized only by specific participants, e.g., loan initiation and maintenance fees, Qualified Domestic Relations Order services, etc. The fees charged for participant-specific services typically account for an insignificant portion of the total fees charged for providing RPS.

46.     Some providers of RPS provide purely RK&A, while others are subsidiaries of financial services and insurance companies that distribute mutual funds, insurance products, and other investment options.

47.     Since the mid-2000s, the retirement plan services provided to "large" defined contribution plans, like the Plan, have increasingly become viewed by prudent plan fiduciaries as a commodity service. While RPS providers in the defined contribution industry attempt to

distinguish themselves through marketing and other means, most RPS providers offer the same bundles and combinations of services as their competitors. As a result, the market for defined contribution retirement plan services is highly competitive, particularly for "large" plans that, like the Plan, have a sizable number of participants and a large amount of assets.

48.     In recent decades, the fee that RPS providers have been willing to accept for providing retirement plan services has significantly decreased.

49.     By the start of and during the entire Class Period, the level of fees that RPS providers have been willing to accept for providing RPS, including RK&A services, has stabilized, and has not materially changed. In other words, reasonable RPS fees paid in 2018 are representative of the reasonable fees for retirement plan services during the entire Class Period.

50.     RPS providers for larger defined contribution plans, like the Plan, experience advantages that lead to a reduction in the per-participant cost as the number of participants in the plan increases. This is because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans. When the number of participants increases in a defined contribution plan, the RPS provider can spread the cost of providing retirement plan services over a larger participant base, reducing the average unit cost of delivering services on a per-participant basis.

51.     Moreover, the cost to an RPS provider to provide services to a participant does not materially differ from one participant to another and is not dependent on the balance of the participant's account. In other words, the average cost to provide RPS is materially identical for a participant that has $10,000 and a participant that has $100,000 or $1,000,000 in plan assets.

52.     Therefore, while the total cost to provide RPS increases as more participants join

the plan, the cost per participant to deliver the RPS decreases. Prudent plan fiduciaries and their consultants and advisors are aware of this cost structure dynamic for retirement plan providers.

53.     Sponsors of defined contribution plans negotiate and contract for RPS separately from any contracts related to the selection of investment management services provided to plan participants.

54.     Often, a portion of the total expense ratio for the investment options selected by plan fiduciaries is allocated to the provision of services that the RPS provider provides on behalf of the investment manager.

55.     As a result, RPS providers often make separate contractual arrangements with mutual fund providers. RPS providers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known in the defined contribution industry as "revenue sharing."

56.     For example, if a mutual fund has a total expense ratio fee of 0.75%, the mutual fund provider may agree to pay the RPS provider 0.25% of the 0.75% total expense ratio fee that is paid by the investor in that mutual fund (in this context the Plan participant). That 0.25% portion of the 0.75% total expense ratio fee is known as the "revenue sharing."

57.     In the context of defined contribution plans, the amount of revenue sharing is deemed to be the amount of revenue paid by participants that is allocable to RPS and, in some cases, other services provided to a plan. The difference between the total expense ratio and the revenue sharing is known as the "net investment expense." When a plan adopts prudent and best practices, the net investment expense is the actual amount a plan participant pays for the investment management services provided by a portfolio manager.

58.     RPS providers typically collect their fees through direct payments from the plan or

through indirect compensation such as revenue sharing, or some combination of both.

59.     Regardless of the pricing structure that the plan fiduciaries negotiate with the RPS provider, the amount of compensation paid to the RPS provider must be reasonable.

60.     As a result, plan fiduciaries must understand the total dollar amounts being paid to their RPS provider(s) and be able to determine whether the compensation is reasonable by evaluating what the market is for the RPS being received by the plan.

61.     Because RPS fees are actually paid in dollars and because of the cost dynamic noted above, the fees paid for RPS are evaluated and compared on a dollars-per-participant basis.

62.     It is axiomatic in the RPS industry that, all else being equal, a plan with more participants can and will receive a lower effective per-participant fee when evaluated on a per-participant basis, and that as participant counts increase, the effective per-participant RPS fee should decrease, assuming the same services are provided.

**B.      STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING AND MONITORING RPS PROVIDERS**

63.     Plan fiduciaries are required to fully understand all sources of revenue received by RPS providers. Fiduciaries must regularly monitor the revenue being paid to RPS providers to ensure that the compensation received is and remains reasonable in view of the services being provided.

64.     The DOL has identified that employers are held to a "high standard of care and diligence" and must, among other duties, "[e]stablish a prudent process for selecting . . . service providers"; "[e]nsure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided"; and "[m]onitor . . . service providers once selected to make sure they continue to be appropriate choices."[7]

_____

[7] *See A Look at 401(k) Plan Fees*, *supra*, note 4, at 2.

65.    The duty to evaluate and monitor plan service provider fees includes those fees directly paid by participants, because "[a]ny costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants."[8]

66.    Prudent fiduciaries will ensure that a plan is paying no more than reasonable fees for RPS by soliciting competitive bids from other RPS providers to perform the same services currently being provided to the plan. This is not a difficult or complex process and is performed regularly by prudent plan fiduciaries. For plans with many participants, like the Plan, most RPS providers would require only the number of participants and the amount of the assets to provide a quote for RPS, while others might only require the number of participants.

67.    Prudent fiduciaries have all of this information readily available and can easily receive a quote from other RPS providers to determine if the current level of fees being charged to the plan is reasonable.

68.    Having received bids, a prudent fiduciary can negotiate with its current provider for a lower fee or move to a new RPS provider to provide the same (or better) services for a competitive (or lower) reasonable fee. Prudent fiduciaries follow this same process to monitor the fees of retirement plan advisors and/or consultants as well as any other covered service providers.

69.    After the revenue requirement is negotiated, the plan fiduciary determines how to pay the negotiated RPS fee. The employer/plan sponsor can pay the RPS fees on behalf of participants, which is the most beneficial to plan participants. If the employer were paying the fee, the employer would have an interest in negotiating the lowest fee a suitable RPS provider would accept. Typically, however, the employer decides to have the plan (i.e., participants) pay the RPS fees. If the RPS fees are paid by participants, the fiduciaries can allocate the negotiated RPS fees

---

[8] Investment Company Institute, *The Economics of Providing 401(k) Plans: Service, Fees, and Expenses*, at 4-5 (June 2018), https://www.ici.org/pdf/per24-04.pdf.

among participant accounts at the negotiated per-participant rate, or pro rata based on account values, among other less common ways.

70.     In other words, if a plan negotiates a per-participant revenue threshold, e.g., $50.00, the plan does not need to require that each participant pay $50.00. Rather, the fiduciaries could determine that an asset-based fee is more appropriate for participants and allocate the RPS fees pro rata to participants. For example, a 10,000-participant plan with a $50.00 revenue threshold would pay $500,000 in RPS fees. If the Plan had $500,000,000 in assets, then the $500,000 would work out to 10 basis points. Accordingly, the Plan could allocate the $500,000 to participants by requiring that each participant pay 10 basis points.

71.     In an asset-based pricing structure, the amount of compensation received by the service provider is based on a percentage of the total assets in the plan. This structure creates situations in which the services provided by the RPS provider do not change but, because of market appreciation and contributions to the plan, the revenue received by the RPS provider increases. This structure was historically preferred by RPS providers because it allowed RPS providers to obtain an increase in revenue without having to ask the client to pay a higher fee.

72.     In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the 401(k) plan's RPS provider putatively for all RPS including, e.g., providing marketing, RK&A, and sometimes other retirement plan services on behalf of the mutual fund. These fees include: 12b-1 fees, which are paid by the funds to the RPS provider as compensation for its services and expenses in connection with the sale and distribution of fund shares; shareholder service fees; and sub-transfer agency fees.

73.     Because revenue sharing payments are asset based, they bear no relation to the actual cost to provide services or the number of plan participants and can result in payment of unreasonable RPS fees.

74.     Because revenue sharing arrangements pay RPS providers asset-based fees, prudent fiduciaries monitor the total amount of revenue sharing an RPS provider receives to ensure that it is not receiving unreasonable compensation at the expense of the plan or plan participants. A prudent fiduciary ensures that the RPS provider rebates to the plan all revenue from any source (including revenue sharing payments) that exceeds a reasonable retirement plan service fee based on the market rate for the same services.

75.     The standard of care outlined above was well known and established prior to the Class Period among prudent plan fiduciaries based on DOL guidelines, case law, and best practices as shared by retirement plan professionals. For example, the standard of care exercised by prudent retirement plan professionals was described by Mercer Investment Consulting, a prominent retirement plan investment consultant, and included, but was not limited to, the following:

a.      "Price administrative fees on a per-participant basis."

b.      "Benchmark and negotiate recordkeeping and investment fees separately."

c.      "Benchmark and negotiate investment fees regularly, considering both fund vehicle and asset size."

d.      "Benchmark and negotiate recordkeeping and trustee fees at least every other year."

e.      "Review services annually to identify opportunities to reduce administrative costs."[9]

---

[9] "Fiduciary Best Practices," *DC Fee Management — Mitigating Fiduciary Risk and Maximizing*

76.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's RPS costs.

77.     First, fiduciaries must pay close attention to the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the RPS provider's expenses by demanding documents that summarize and contextualize the RPS provider's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

78.     Second, to make an informed evaluation as to whether an RPS or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent hypothetical fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's RPS provider. To the extent that a plan's investments pay asset-based revenue sharing to the RPS provider, prudent fiduciaries monitor the amount of the payments to ensure that the RPS provider's total compensation from all sources does not exceed reasonable levels and require that any revenue-sharing payments that exceed a reasonable level be returned to the plan and its participants.

79.     Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the RPS rates that are available. This will often include conducting a request for proposal ("RFP") process at reasonable intervals. More specifically, it is understood that the best practice standard of care indicates that an RFP should be issued once every three to five years.

_Plan Performance_, Mercer Investment Consulting, at 3-4 (2013), https://www.mercer.at/content/dam/mercer/attachments/global/Retirement/DC%20Fee%20Mana gement%20-%20Mitigating%20Fiduciary%20Risk%20and%20Maximizing%20Plan%20Performance.pdf.

80.     That said, by merely soliciting bids from other RPS providers, plan fiduciaries can quickly and easily gain an understanding of the current market for materially identical retirement plan services and determine a starting point for negotiation. Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids through some process, be it formal or informal, that provides an incentive to RPS providers to provide a competitive bid.

81.     All of these standards are accepted and understood by prudent plan fiduciaries and were, or should have been, understood by Defendants at all times during the Class Period. This is because prudent fiduciaries understand that excessive fees significantly impact the value of participants' retirement accounts.

## C.     **DEFENDANTS DISLOYALLY AND IMPRUDENTLY PERMITTED THE PLAN TO PAY EXCESSIVE RPS FEES TO USI CONSULTING GROUP**

82.     USI, through its wholly owned subsidiary, USICG, provides RPS and investment consulting services to defined contribution retirement plans.

83.     Defendants selected USICG as the Plan's RPS provider and then failed to prudently and loyally monitor the Plan's RPS expenses, instead allowing the Plan to pay nearly three times what a prudent and loyal fiduciary would have paid for such services. These excessive RPS fees resulted in millions of dollars in additional losses to the Plan and its participants during the statutory period, while further enriching USI.

84.     Notably, based on 2019 Form 5500 data, the Plan was the only plan with more than $300 million in assets for which USICG provided retirement plan services. Similarly, the Plan was the only plan with more than 5,200 participants for which USICG provided retirement plan services. Excluding the Plan, the average size of plans for which USICG provided retirement plan services was a mere $21 million and 471 participants.

85.     A prudent fiduciary would have negotiated an appropriate fee for RPS consistent with the prevailing market rate whether the services were provided by USICG or any other provider.

86.     Making matters worse, and unlike most other retirement plan service providers, USI (through USICG) presents itself as a "premier provider of defined contribution . . . consulting and administration services [and helps plan sponsors] attain the highest levels of fiduciary compliance in an efficient and cost-effective manner."  The fact that USI did not follow the same procedures to negotiate reasonable fees for the Plan that they used for other USICG clients is indicative of improper self-dealing and disloyalty.

87.     For example, USICG was able to negotiate for its consulting clients reasonable RPS fees with other quality providers. The RPS provided by these other quality providers were materially identical to the RPS provided by USICG to the Plan and the quality was at least materially as good as the RPS provided by USICG.  For example, USI Advisors was able to negotiate for its client Rexel Inc., which has fewer participants than the Plan, a lower effective per-participant RPS fee rate for materially identical services at materially identical quality.

88.     Additionally, USICG provides materially similar RPS to other USICG RPS clients for a lower effective per-participant fee rate than the fees charged to the Plan.  This, along with the fact that the Plan is USI's largest retirement plan service provider client leads to the inference that USI is using its own Plan to subsidize its other clients.

89.     Form 5500 data reveals that USI has several clients that are paying a lower effective per-participant fee rate for RPS than what the Plan pays.   For example, Sound Physicians 401(k) has approximately half of the participants and one-third of the assets of the USI 401(K) Plan, yet is paying a reasonable fee for the retirement plan services provided by USICG while the Plan has

been paying around two to three times a reasonable fee for the same RPS.

90.     In addition to the Plan paying more for services provided by USICG than other smaller plans paid to USICG, at all relevant times the Plan's RPS fees were excessive when compared with other similar-sized plans receiving materially the same services. The fees charged to the Plan were excessive relative to the RPS received by the Plan. These excessive fees led to lower net returns, eating into and substantially reducing Plaintiff's and Plan participants' retirement savings.

91.     During the Class Period, Plan participants paid for retirement plan services directly through fees deducted from their accounts and indirectly through revenue sharing.

92.     Upon information and belief, during the Class Period, each Plan participant paid a retirement plan service fee of at least $12.25 per quarter, or $49 per year, deducted directly from their accounts. USICG characterizes this fee as a quarterly "service fee" in participants' account statements.

93.     Additionally, the Plan (i.e., the participants) paid retirement plan service fees indirectly through revenue sharing. During the Class Period, the Plan disclosed payment of the following compensation to USICG, as seen in Schedule C of the Plan's Forms 5500:

| Compensation to USI Consulting Group (source: Forms 5500, Schedule C) | | | |
|---|---|---|---|
| **Plan Year** | **Direct** | **Service Codes** | **Service Code Explanations** |
| 2015 | $757,867 | 12, 15, 17, 25, 34, 37, 60, 61, 62, 63, 64, 65 | Claims processing; Recordkeeping and information management (computing, tabulating, data processing, etc.); Consulting (pension); Trustee (directed); Valuation (appraisals etc.); Participant loan processing; Sub-transfer agency fees; Finders' fees/placement fees; Float revenue; Distribution (12b-1) fees; Recordkeeping fees; Account maintenance fees |
| 2016 | $827,497 | 12, 15, 17, | Claims processing; Recordkeeping and information |

| 2017 | $888,775 | 25, 34, 37, 57, 60, 61, 63, 64, 65 | management (computing, tabulating, data processing, etc.); Consulting (pension); Trustee (directed); Valuation (appraisals etc.); Participant loan processing; Redemption fees; Sub-transfer agency fees; Finders' fees/placement fees; Distribution (12b-1) fees; Recordkeeping fees; Account maintenance fees |
|------|----------|-----|-----|
| 2018 | $705,235 | | |
| 2019 | $881,861 | | |
| **Total** | **$4,061,235** | | |

94.     The service codes disclosed in the Plan's Forms 5500 reveal that for each year in the Class Period, Defendants permitted the Plan to pay sub-transfer agency fees to USICG. Sub-transfer agency fees are fees paid by mutual fund managers to an RPS provider who holds an omnibus account at the mutual fund company. Omnibus accounting eliminates the need for the mutual fund company to maintain individual participant accounts. Instead, participant accounts are maintained by the RPS provider. Because this effectively shifts some costs from the mutual fund to the RPS provider, the mutual fund companies pay the RPS provider a fee for this service. Typically, this fee ranges from 0.10% to 0.35% of invested assets but can be much higher. In some cases, the mutual fund company pays no fee.

95.     The sub-transfer agency fee is included as part of the mutual fund's operating expense, which is paid by the Plan participants who invest in the fund. Because a portion of that operating expense is paid to USICG to compensate it for recordkeeping, Plan participants who invest in the mutual funds paying sub-transfer agency fees to USICG essentially pay USICG both through fees extracted directly from their account as well as indirectly through the investment options that contain revenue sharing.

96.     Prudent plan fiduciaries monitor and limit the amount of indirect compensation, such as 12b-1 and sub-transfer agency fees, to make sure that plan participants are not overcharged for recordkeeping, and require that excessive fees be rebated to plan participants. Here, Defendants failed to properly monitor the indirect compensation paid to USI through its consulting arm

USICG, which caused the Plan to pay excessive RPS fees for the Class Period.

97.    During the Class Period, Plaintiff and Plan participants paid between $81-$154 per year in RPS expenses. The table below shows the actual and average yearly per-participant RPS fees paid by participants, including by direct charges to their accounts and payments made by the Plan:

| Retirement Plan Service (RPS) Fees Per-Participant Cost (source: Forms 5500) | | | | | | |
|---|---|---|---|---|---|---|
| | Plan Year | | | | | |
| | **2015** | **2016** | **2017** | **2018** | **2019** | *Average* |
| Participants | 5,394 | 5,427 | 8,154 | 8,883[10] | 9,867 | **7,545** |
| | | | | | | |
| Total RPS Fees | $767,330 | $838,112 | $903,767 | $720,654 | $900,953 | $826,163 |
| | | | | | | |
| **Per-Participant RPS Fee** | $142 | $154 | $111 | $81 | $91 | **$109** |

98.    The table illustrates that the Plan had on average 7,545 participants and paid an average effective annual RPS fee of approximately $826,163, which equates to an average of approximately $109 per participant, per year. This fee is exorbitant and unreasonable. Defendants' decision to maintain this RPS relationship with its own consulting group USICG, in which Plan participants were paying on average $109 per person per year, was disloyal and imprudent. This high per-participant RPS expense is not in line with the fees paid by participants in other similar plans administered by prudent fiduciaries.

99.    The cost of adding participants to a recordkeeping platform is relatively low, and

---

[10] The number of participants for 2018 is estimated due to the obvious typo in Line 6G of the 2018 Form 5500 by using the difference between Line 6F comparing 2017 to 2018 and adding that to the amount in Line 6G of the 2018 Form 5500.

when participant numbers grow, the unit cost of delivering services on a per-participant basis should decrease. This inverse correlation of participants to the effective annual per-participant RPS fees was not always manifested in the Plan during the Class Period. The Defendants should have been able to achieve a decrease in the annual per-participant RPS fee as the number of participants in the Plan grew, but failed to do so. Namely, between 2015 and 2016, the number of participants increased by approximately 30 participants, yet the effective per-participant fee unreasonably increased by more than $10.

100.    The Plan's fiduciaries were required to continuously monitor RPS fees, and to regularly solicit competitive bids to ensure fees being paid to its own consulting group were reasonable. However, Defendants failed to act loyally to participants and to employ prudent processes for ensuring that fees were and remained reasonable. To the extent there was a process in place that was followed by Defendants, it was imprudent and ineffective given the objectively unreasonable RPS fees paid.

101.    Due to Defendants' fiduciary failures and the absence of prudent fiduciary processes to monitor fees for reasonableness, the Plan's RPS fees were significantly higher than they would have been had Defendants engaged in prudent processes, and they were significantly higher than RPS fees assessed to participants in similar plans. The table below illustrates the effective annual per-participant RPS fees paid in 2018 by other comparable plans with similar numbers of participants derived from Form 5500 filings, compared to the average effective annual per-participant retirement plan service fee paid by the Plan (as identified in the table above) during the Class Period.

**Comparable Plans' RK&A Fees Based on Publicly Available Information from Form 5500[1]**

| Plan | Participants | Assets | RK&A Price | RK&A Price /pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| Genesis Health System Retirement Savings Plan | 6,260 | $231,793,794 | $325,894 | $52 | Transamerica | Blue |
| Flowserve Corporation Retirement Savings Plan | 6,395 | $892,435,613 | $263,380 | $41 | T. Rowe Price | Blue |
| St. Luke's Health Network 403(B) Plan | 7,142 | $241,600,647 | $333,578 | $47 | Transamerica | Blue |
| Memorial Health System Defined Contribution Retirement Savings Plan | 7,318 | $221,242,194 | $385,754 | $53 | Transamerica | Blue |
| **USI 401(K) Plan Average Fee** | **7,545** | **$586,293,191** | **$826,163** | **$109** | **USI Consulting Group** | **Red** |
| The Boston Consulting Group, Inc. Employees' Savings Plan And Profit Sharing Retirement Fund | 8,067 | $894,454,060 | $336,660 | $42 | Vanguard | Blue |
| Bausch Health Companies Inc. Retirement Savings Plan | 8,902 | $920,172,019 | $322,496 | $36 | Fidelity | Blue |
| Children's Medical Center Of Dallas Employee Savings Plan 403(B) | 9,356 | $349,335,673 | $337,416 | $36 | Fidelity | Blue |
| Ralph Lauren Corporation 401(K) Plan | 9,389 | $543,889,968 | $290,066 | $31 | T. Rowe Price | Blue |
| Vibra Healthcare Retirement Plan | 9,750 | $107,652,510 | $277,532 | $28 | Great-West | Blue |
| Republic National 401(K) Plan | 9,922 | $671,989,837 | $324,171 | $33 | Great-West | Blue |

[1]Price calculations are based on 2018 Form 5500 information or the most recent Form 5500 if 2018 is not available.

102.    Similarly, the graph below illustrates the average annual RPS fee paid by the Plan compared to the effective annual per participant RPS fee paid by the plans identified in the table above, with the white data points representing RPS fees that RPS providers offered to (and were accepted by) comparable Plans for the materially identical level of services.



103.    As the above graph makes clear, during the Class Period, both plans with fewer participants (for which the reasonable per-participant RPS fees are higher) and plans with a similar number of participants, paid a significantly lower effective per-participant RPS fee than the Plan paid.

104.    This graph illustrates that other RPS providers would have accepted much lower RPS fees for materially identical services to those provided to the Plan by USICG.

105.    The level and quality of service provided by USICG as the Plan RPS provider did not justify paying on average more than two and a half times more than the reasonable market rate for retirement plan services.

106.    Based upon a review of the Plan's Forms 5500, and upon information and belief, the Plan also did not rebate any of the monies received from revenue sharing back to Plan participants to offset the RPS fees paid by the participants.

107.    Because revenue sharing payments are asset-based, the already-excessive

compensation paid to the Plan's RPS provider became even more excessive as the Plan's assets grew, even though the administrative services provided to the Plan remained the same. Defendants could have capped the amount of revenue sharing to ensure that any excessive amounts were returned to the Plan as other prudently-administered plans do, but failed to do so.

108.    Defendants were not motivated to make these prudent decisions because years ago Defendants made the decision to hire USI's own consulting group to provide RPS to the Plan.  In doing so, USI was enriched by a steady diet of fees charged to the Plan—i.e., its own employees—through USICG. Given the numerous third-party RPS providers available to provide recordkeeping services at a significantly cheaper cost to the Plan on a per-participant basis than what was and continues to be charged by USICG, Defendants cannot justify maintaining USICG as the Plan's RPS provider, and the decision to do so was imprudent and disloyal.

109.    Had Defendants been acting in the exclusive best interest of the Plan's participants and engaged in prudent processes for selecting and negotiating with RPS providers, rather than paying an effective average of approximately $109 per participant per year in RPS fees from 2015-2019, the Defendants would have identified one of the many RPS providers that would have accepted on average around $42 per participant per year for the Plan.

110.    The $109 per-participant-per-year average is more than two and a half times the amount charged to participants in similar plans where prudent fiduciaries have established and maintained a prudent process for selecting and monitoring the fees of RPS providers.  Prudent fiduciaries would have never initially agreed to the RPS fees being assessed to the Plan participants starting in 2015, nor would prudent fiduciaries have permitted the unreasonable RPS fees to continue in perpetuity.

111.    Defendants, acting loyally to and in the best interests of Plan participants, would

not have agreed to allow an in-house RPS provider to continue to charge excessive RPS fees that are more than two and a half times the reasonable rate.

112.    Defendants did not regularly and/or reasonably assess the Plan's RPS fees being paid to USICG. Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the RPS fees it paid to USICG vis-à-vis the fees that other RPS providers would charge for the same services.

113.    Defendants knew or should have known that ERISA's duties of loyalty and prudence required them to consider and seek quotes from RPS providers other than USI's own consulting company in view of the fees it was charging and to engage in processes to evaluate the reasonableness of the Plan's RPS fees, but Defendants simply failed to do so. Had Defendants done so, they would have concluded that the Plan was compensating USICG unreasonably and inappropriately in view of the Plan's size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff and Plan participants, and that the fees were excessive relative to the services received.

114.    Defendants' failure to recognize that the Plan and its participants were grossly overcharged for RPS fees and their failure to take effective remedial actions shows a lack of or a complete disregard for participant loyalty and a prudent process, and was a breach of their fiduciary duties to Plaintiff and the Plan participants.

115.    Defendants imprudently failed to monitor and control the compensation paid by the Plan for RPS, including direct compensation, sub-transfer agency fees, and asset-based revenue sharing paid to USICG. Had Defendants monitored the compensation paid to USICG and ensured that participants were only charged reasonable RPS fees, Plan participants would not have lost millions of dollars in their retirement savings over the last six years.

## VI.   **ERISA'S FIDUCIARY STANDARDS**

116.   Under ERISA, a person is a fiduciary to the extent he or she: (1) exercises any discretionary authority or control over management of the Plan or the management or disposition of its assets; (2) renders investment advice regarding Plan assets for a fee or other direct compensation, or has the authority or responsibility to do so; or (3) has any discretionary authority or control over Plan administration. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

117.   As set forth above and herein, Defendants are Plan fiduciaries. ERISA imposes strict fiduciary standards of loyalty and prudence on Defendants as Plan fiduciaries. 29 U.S.C. § 1104(a)(1) provides in relevant part:

> (1)   . . . a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)  for the exclusive purpose of:
>
>> (i) providing benefits to participants and their beneficiaries; and
>>
>> (ii) defraying reasonable expenses of administering the plan; [and]
>
> (B)  with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>
>       * * *
>
> (D)  in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA].

118.   29 U.S.C. § 1103(c)(1) provides in relevant part:

> [T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

119.   ERISA fiduciary duties are the highest known to the law and must be performed with an eye exclusively to the interests of participants. ERISA fiduciaries exercising authority or

control over plan assets, including the selection of plan service providers, must act prudently and

for the exclusive benefit of participants in the plan, and not for the benefit of others, including RPS

providers to the Plan or firms who provide investment products and services. Fiduciaries must

ensure that the amount of fees paid to those service providers is no more than reasonable. DOL

Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1). Defendants' fiduciary

duties apply continuously in the administration of the Plan and do not abate upon the engagement

of service providers. Fiduciaries must ensure that the amount of fees paid to service providers is

reasonable, and they have an ongoing duty to monitor fees being paid to plan service providers for

reasonableness.

120.    ERISA also imposes co-fiduciary liabilities on Plan fiduciaries. 29 U.S.C. §

1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by

another fiduciary and knowingly failing to cure any breach of duty:

> In addition to any liability which he may have under any other provisions of this
> part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary
> responsibility of another fiduciary with respect to the same plan in the following
> circumstances:
>
>> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act
>> or omission of such other fiduciary, knowing such act or omission is a breach;
>> [or]
>>
>> (2) if, by his failure to comply with section 1104(a)(1) of this title in the
>> administration of his specific responsibilities which give rise to his status as a
>> fiduciary, he has enabled such other fiduciary to commit a breach; or
>>
>> (3) if he has knowledge of a breach by such other fiduciary, unless he makes
>> reasonable efforts under the circumstances to remedy the breach.

121.    29 U.S.C. §1132(a)(2) of ERISA authorizes a participant to bring a civil action

under 29 U.S.C. §1109(a), which provides:

> Any person who is a fiduciary with respect to a plan who breaches
> any of the responsibilities, obligations, or duties imposed upon

fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

122.    Section 1132(a)(3) authorizes a participant to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

## VII.    CLASS ACTION ALLEGATIONS

123.    Pursuant to 29 U.S.C. § 1132(a)(2), ERISA authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a).

124.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as the representative of, the following class (the "Class"):

All participants and beneficiaries to the USI 401(k) Plan from March 2, 2015, through the date of judgment.

125.    Excluded from the Class are Defendants and any Plan fiduciaries. Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

126.    This action meets the requirements of Rule 23 of the Federal Rules of Civil

Procedure and is certifiable as a class action for the following reasons:

127. **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that many thousands of persons comprise the Class. Per Form 5500 filed with the DOL for the Plan year ending December 31, 2019, the Class includes at least 9,867 individual current Plan participants.

128. **Existence and Predominance of Common Questions of Law and Fact:** Common questions of law and fact exist as to all members of the Class because Defendants owed fiduciary duties to the Plan and to all Plan participants and beneficiaries, and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a. whether the fiduciaries are liable for the remedies provided by 29 U.S.C. § 1109(a);

b. whether Defendants were fiduciaries to the Plan under ERISA;

c. whether Defendants breached fiduciary duties to the Plan in violation of ERISA;

d. whether the Plan and Plan participants are entitled to damages or monetary relief as a result of Defendants' breaches of fiduciary duties;

e. if so, the amount of damages or monetary relief that should be provided to the Plan and its participants;

f.      what Plan-wide equitable and other relief the Court should impose in light of Defendants' breaches; and

g.      whether the Plan and its participants are entitled to any other relief as a result of Defendants' breaches and conduct alleged herein.

129.    Given that Defendants have engaged in a common course of conduct as to Plaintiff and the Class, similar or identical injuries and violations are involved, and common questions far outweigh any potential individual questions.

130.    **Typicality**: All of Plaintiff's claims are typical of the claims of the Class because Plaintiff was, and is, a Plan participant during the Class Period and all Plan participants were harmed by the uniform acts and conduct of Defendants discussed herein. Plaintiff, all Class members, and the Plan sustained monetary and economic injuries including, but not limited to, ascertainable losses in retirement income and retirement account value, arising out of Defendants' breaches of their fiduciary duties to the Plan.

131.    **Adequacy:** Plaintiff is an adequate representative for the Class because Plaintiff's interests do not conflict with the interests of the Class that she seeks to represent; Plaintiff was a Plan participant during the Class Period and continues to participate in the Plan; and Plaintiff is committed to vigorously representing the Class. Plaintiff has retained counsel competent and highly experienced in complex class action litigation – including ERISA and other complex financial class actions – and counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and Plaintiff's counsel.

132.    **Superiority:** A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small, and it

would be impracticable for individual members to enforce their rights through individual actions. Even if Class members could afford individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, the records (including databases, e-mails, etc.) that Defendants maintain regarding the Plan. Given the nature of the allegations, no Class member has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action.

133.   Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

## VIII.   <u>CAUSES OF ACTION</u>

<u>COUNT I</u>
**Breach of Duty of Prudence Under ERISA:**
**Imprudent and Unreasonable RPS Fees**
**(Plaintiff, individually and on behalf of the Class)**

134.   Plaintiff incorporates the above allegations as if fully set forth herein.

135.   Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

136.   29 U.S.C. § 1104 imposes fiduciary duties of prudence upon Defendants in their administration of the Plan.

137.    Defendants, as fiduciaries of the Plan, are responsible for selecting an RPS provider that charges reasonable retirement plan service fees.

138.    During the Class Period, Defendants had a fiduciary duty to do all of the following:

    a.    ensure that the Plan's retirement plan service fees were reasonable;

    b.    manage the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries;

    c.    defray reasonable expenses of administering the Plan; and

    d.    act with the care, skill, diligence, and prudence required by ERISA.

139.    During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's RPS provider to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding recordkeeping services and the significant bargaining power the Plan had to negotiate the best fees.

140.    During the Class Period, Defendants breached their fiduciary duty of prudence to Plan participants, including Plaintiff, by:

    a.    Allowing the Plan to pay multiples of the reasonable per-participant amount for the Plan's retirement plan service fees;

    b.    Failing to properly disclose the fees charged to Plan participants in their quarterly statements or fee disclosures;

    c.    Failing to defray reasonable expenses of administering the Plan; and

    d.    Failing to act with the care, skill, diligence, and prudence required by ERISA.

141.    During the Class Period, Defendants breached their duty to Plan participants, including Plaintiff, by failing to employ or follow a prudent process to critically or objectively evaluate the cost and performance of the Plan's RPS provider in comparison to other RPS options.

142.    Through these actions and omissions, Defendants breached their fiduciary duties of prudence with respect to the Plan in violation of 29 U.S.C. § 1104(a)(1)(A).

143.    Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of a like character and with like aims, thus breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

144.    As a result of Defendants' breach of fiduciary duties, Plaintiff and Plan participants suffered objectively unreasonable and unnecessary monetary losses.

145.    Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3).

<u>**COUNT II**</u>
**Failure to Adequately Monitor Other Fiduciaries Under ERISA:**
**Imprudent and Unreasonable RPS Fees**
**(Plaintiff, individually and on behalf of the Class)**

146.    Plaintiff incorporates the above allegations as if fully set forth herein.

147.    Defendants had the authority to appoint and remove individuals responsible for retirement plan service fees for the Plan and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

148.    In light of this authority, Defendants had a duty to monitor those individuals responsible for overseeing retirement plan service fees for the Plan to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

149.    Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analyses respecting Plan decisions; and reported regularly to Defendants.

150.    Defendants breached their fiduciary duties by, among other things:

a.    Failing to monitor and evaluate the performance of individuals responsible for retirement plan service fees for the Plan, or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high retirement plan service fee expenses;

b.    Failing to monitor the process by which the Plan RPS provider was evaluated and failing to investigate the availability of lower-cost RPS providers;

c.    Failing to remove individuals responsible for RPS fees for the Plan whose performance was inadequate in that these individuals continued to pay the same RPS fees even though benchmarking and using other similar comparators would have shown that maintaining USICG as the RPS provider altogether or at the current level of fees being paid to it was imprudent and excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

151.    As consequences of the foregoing fiduciary breaches, Plaintiff and Plan participants suffered unreasonable and unnecessary monetary losses.

152.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor individuals responsible for retirement plan service fees for the Plan. In addition, Plaintiff is entitled to equitable relief and other appropriate relief.

**COUNT III**
**Breach of Duty of Loyalty Under ERISA:**
**Imprudent and Unreasonable RPS Fees--USICG**
**(Plaintiff, individually and on behalf of the Class)**

153.    Plaintiff incorporates the above allegations as if fully set forth herein.

154.    Defendants, as fiduciaries of the Plan, are responsible for selecting RPS providers that charge reasonable fees, including for recordkeeping services.

155.    In selecting RPS providers, Defendants owed a duty of loyalty to Plaintiff and Plan participants to act solely in their interests and for their exclusive benefit.

156.    During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's RPS provider to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding recordkeeping services and the significant bargaining power the Plan had to negotiate the best fees.

157.    During the Class Period, Defendants breached their fiduciary duty of loyalty to Plan participants, including Plaintiff, by:

      a.    Employing its wholly owned subsidiary, USICG, as the Plan RPS provider;

      b.    Allowing the Plan to pay USICG multiples of the reasonable per-participant amount for the Plan's RPS fees, which ultimately inured to the benefit of the Plan sponsor;

      c.      Failing to properly disclose the fees charged by USICG to Plan participants in their quarterly statements or fee disclosures;

      d.      Failing to defray reasonable expenses of administering the Plan; and

      e.      Allowing the Plan to maintain USICG as the Plan's RPS provider despite the unreasonable level of fees being charged by USICG for those services, which inured to the benefit of Defendant USI.

158.    During the Class Period, Defendants breached their duty of loyalty to Plan participants, including Plaintiff, by failing to remove USICG as the Plan's RPS provider when it was apparent that (a) the fees charged by USICG were excessive in comparison to other recordkeeping options and (b) the only reason USICG was maintained as the Plan's RPS provider, despite charging excessive fees for its services, is that it is the consulting arm of Defendant USI.

159.    Through these actions and omissions, Defendants breached their fiduciary duties of loyalty with respect to the Plan in violation of 29 U.S.C. § 1104(a)(1)(A).

160.    As a result of Defendants' breach of fiduciary duties, Plaintiff and Plan participants suffered objectively unreasonable and unnecessary monetary losses.

161.    Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3).

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

      A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil

Procedure;

B.  Designate Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

C.  A declaration stating that Defendants have breached their fiduciary duties under ERISA;

D.  An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from the failure to properly monitor and control RPS fees, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.  An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

F.  Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

G.  An award of pre-judgment interest;

H.  An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.  Such other and further relief as the Court deems equitable and just.

## IX.   NOTICE PURSUANT TO ERISA SECTION 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned affirms, that upon this filing of this Class Action Complaint with redactions as approved by the Court, a true and correct copy of this Class Action Complaint will be served upon the Secretary of Labor and the Secretary of Treasury by certified mail, return receipt requested.

Dated: March 2, 2021                    By: */s/Timothy L. Foster*
                                             Franklin D. Azar (*pro hac vice* forthcoming)
                                             Paul R. Wood (*pro hac vice* forthcoming)
                                             Timothy L. Foster (SDNY TF8896)
                                             FRANKLIN D. AZAR & ASSOCIATES, P.C.
                                             14426 East Evans Avenue
                                             Aurora, CO 80014

Telephone: (303) 757-3300
Fax: (720) 213-5131
Email: azarf@fdazar.com
      woodp@fdazar.com
      fostert@fdazar.com

and

Steven A. Schwartz (PA ID No. 50579)
(*pro hac vice* forthcoming)
CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Tel: (610) 642-8500
Fax: 610-649-3633
Email: sas@chimicles.com

*Counsel for Plaintiff*