**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| LAUREN CUNNINGHAM, individually and as a representative of a class of participants and beneficiaries in and on behalf of the USI 401(k) PLAN, | ) ) ) ) | Civil Action No. 7:21-cv-01819 |
| Plaintiff, | ) ) | |
| v. | ) ) | CLASS ACTION |
| USI INSURANCE SERVICES, LLC; | ) ) | |
| and | ) ) | |
| BOARD OF DIRECTORS OF USI INSURANCE SERVICES, LLC; | ) ) ) | |
| and | ) ) | |
| USI 401(k) PLAN COMMITTEE; | ) ) | |
| and | ) ) | |
| JOHN AND JANE DOES 1-30, | ) ) | |
| Defendants. | ) ) | |

**AMENDED COMPLAINT**

1.     Plaintiff Lauren Cunningham ("Plaintiff"), on behalf of the USI 401(k) Plan (the "Plan"), individually and as representative of a class of participants and beneficiaries, brings this action asserting claims for breaches of fiduciary duties and other violations of 29 U.S.C. §1132(a)(2) and (3) against USI Insurance Services, LLC; the USI 401(k) Plan Committee; the Board of Directors of USI Insurance Services, LLC; and John and Jane Does 1-30 (collectively, "Defendants"), and for her Amended Complaint, alleges as follows.

**I.     INTRODUCTION**

2.     Every year, millions of employees entrust their retirement savings to plans

established under the Employee Retirement Income Security Act of 1974 ("ERISA") (29 U.S.C.

§1001 *et seq*.) Under ERISA, employers and those they designate to oversee employee retirement

plans are fiduciaries, who are obligated to act loyally and prudently to protect plan participants

and their hard-earned retirement dollars.

3.      As of September 2021, Americans had invested approximately $10.4 trillion in

assets in defined contribution plans, such as 401(k) and 403(b) plans.[1] Defined contribution plans

have largely replaced defined benefit plans—or pension plans—that were predominant in previous

generations.[2] Today, only 17% of private sector employees have access to a defined benefit plan,

while 64% have access to a defined contribution plan. *Id*.

4.      The fiduciary duties imposed by ERISA are among "the highest duty known to the

law." *Leber v. Citigroup, Inc.*, No. 07 CIV. 9329 (SHS), 2010 WL 935442, at \*13 (S.D.N.Y. Mar.

16, 2010) (quoting *La Scala v. Scrufari*, 479 F.3d 213, 220 (2d Cir.2007)). ERISA fiduciaries must

act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), with the

"care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope.

29 U.S.C. § 1104(a)(1)(B).

5.      The essential remedial purpose of ERISA is to protect the beneficiaries of private

retirement plans. ERISA fiduciaries have a continuing duty to evaluate fees and expenses assessed

to a plan, or its participants, in order to make sure those charges are reasonable and prudent.

6.      Failures by ERISA fiduciaries to monitor costs for reasonableness have stark

financial consequences for retirees. Every extra level of expenses imposed upon plan participants

compounds over time and reduces the value of participants' investments available upon retirement.

---

[1] *See Retirement Assets Total $37.2 Trillion in Second Quarter 2021,* INVESTMENT COMPANY INSTITUTE
(Sept. 27, 2021), https://www.ici.org/statistical-report/ret_21_q2.
[2] *See* James McWhinney, *The Demise of the Defined-Benefit Plan*, INVESTOPEDIA (Updated Nov. 16,
2020), https://www.investopedia.com/articles/retirement/06/demiseofdbplan.asp.

7.     The Plan is a defined-contribution plan in which each individual participant has an account into which a defined amount can be contributed by the participant, by the Plan sponsor USI Insurance Services, LLC (or its subsidiaries and affiliates), or by both. With 10,898 participants and more than $1 billion in net assets as of December 31, 2020, based on the publicly available 2020 Form 5500 filed with the United States Department of Labor ("DOL") on October 15, 2021, the Plan is larger than 99.60% of defined contribution plans in terms of participants and larger than 99.83% in terms of assets and is thus considered a "large" retirement plan.

8.     The Defendants are ERISA fiduciaries pursuant to 29 U.S.C. § 1002(21)(A), because they exercise discretionary authority or discretionary control over the Plan, which Defendants sponsor and administer. As fiduciaries to the Plan, Defendants were and are obligated to act prudently and solely in the interest of the Plan participants to ensure that Plan fees and expenses are reasonable.

9.     The marketplace for retirement plan services ("RPS") is well established and highly competitive. As a large plan since (at least) 2015, the Plan had tremendous bargaining power to demand low-cost administrative and investment management services, a fact that USI was aware of because the subsidiary of USI that serves as the recordkeeper for the Plan, USI Consulting Group ("USICG"), provides consulting and RPS services to other defined contribution plans.

10.     As fiduciaries of the Plan, Defendants are obligated to limit the Plan's expenses to a reasonable amount, to ensure that each mutual fund or investment option available in the Plan is a prudent option for participants to invest their retirement savings and is priced at a reasonable level for the size of the Plan, and to analyze costs and benefits of alternatives for the Plan's administrative and investment structure. A prudent plan fiduciary must continuously monitor investment fees against applicable benchmarks, peer groups, and the market, in order to identify

objectively unreasonable and unjustifiable fees.

11.     Instead of leveraging the Plan's substantial bargaining power to limit expenses, Defendants imprudently placed their interests ahead of the interests of Plaintiff and other Plan participants and beneficiaries by using USI's wholly-owned subsidiary, USICG,[3] to provide the RPS to the Plan, causing participants to pay higher fees than they would have paid using USICG's competitors.

12.     The decision to use USI's in-house consulting group cannot be justified in light of the excessive and unreasonable amount of RPS fees paid to USICG. This decision was imprudent and disloyal to the Plan participants because it elevated Defendants' financial interests above the interests of Plan participants.

13.     Defendants breached their fiduciary duties of prudence and loyalty owed to the Plan, to Plaintiff, and all other Plan participants by (a) retaining USICG as the Plan's RPS provider; (b) allowing USICG to charge unreasonable recordkeeping and administrative expenses to the Plan; and (c) failing to investigate other, more prudent alternative RPS providers when such providers were readily available throughout the Class Period (March 2, 2015 through the date of judgment).

14.     Plaintiff was injured by the Defendants' actions because Defendants permitted all Plan participants to be charged excessive recordkeeping and administrative expenses fees, which benefited USI and USICG, but reduced Plaintiff's and other Plan participants' account balances and caused them significantly diminished investment returns.

15.     To remedy Defendants' fiduciary breaches, Plaintiff, individually and as representative of a class of participants and beneficiaries in the Plan, brings this action on behalf

_____

[3] *See* USI Consulting Group, About Us, https://www.usicg.com/about-us/your-retirement-and-benefit-plan-partner/ (last visited May 18, 2022).

of the Plan under 29 U.S.C. § 1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan all losses resulting from each breach of fiduciary duty, as alleged in more detail herein. In addition, Plaintiff seeks such other equitable or remedial relief for the Plan as the Court may deem appropriate.

16.     The allegations in this Amended Complaint are based upon information and belief and an investigation by undersigned counsel, including, but not limited to, review of Plan filings with the DOL, other publicly available documents, documents filed by Defendants in support of their Motion to Dismiss (ECF 31) and other analytical investment data. Defendants have possession of additional material information relating to the claims herein, and Plaintiff reserves the right to amend this Amended Complaint as those materials become available in the course of this litigation.

## II.     <u>JURISDICTION AND VENUE</u>

17.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331, which provide for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. §§ 1001 *et seq.*

18.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, have significant contacts within this District, and because ERISA provides for nationwide service of process.

19.     This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) because the Plan is administered in this District; the Plan is deemed to reside in this District; some or all of the ERISA violations alleged herein took place in this District; and the Plan can be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because

Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.    PARTIES

#### A.    Plaintiff Lauren Cunningham

20.    Plaintiff Lauren Cunningham ("Plaintiff") is a resident of Sandy Springs, Georgia. Plaintiff is a current "participant" in the Plan, as that term is defined under 29 U.S.C §1002(7), because she has a vested account balance in the Plan and her beneficiaries are or may become eligible to receive benefits under the Plan. Plaintiff participates in the Plan through her employer, USI Insurance Services, LLC. Plaintiff was and is a participant in the Plan from 2017 through the present. During the Class Period, Plaintiff paid excessive RPS fees directly and indirectly through revenue sharing.

21.    Plaintiff has Article III standing to bring this action because she suffered an actual injury to her own individual Plan account in which she is still a participant, that injury is fairly traceable to Defendants' breaches of fiduciary duties in violation of ERISA, and the harm is likely to be redressed by a favorable judgment.

22.    The Plan also suffered harm caused by Defendants' fiduciary breaches and remains exposed to harm and continued future losses. The Plan is the victim of a fiduciary breach and will be the recipient of any recovery. Plaintiff's claims are brought in a representative capacity on behalf of the Plan as a whole and seek remedies under 29 U.S.C. § 1109 to protect the entire Plan. Plaintiff and all participants and beneficiaries in the Plan suffered ongoing financial harm as a result of Defendants' continued disloyal, imprudent, and unreasonable decisions respecting Plan fees and services. Those injuries may be redressed by a judgment of this Court in favor of Plaintiff.

23.    Plaintiff did not have knowledge of all material facts (including, among other

things, the RPS fees and total cost comparisons to similarly-sized plans) necessary to understand that Defendants breached (and continue to breach) their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed. Plaintiff lacked actual knowledge of Defendants' disloyalty in selecting USICG as the Plan's RPS provider and of reasonable fee levels and prudent fee alternatives available to the Plan. Further, Plaintiff did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting, monitoring, evaluating, and removing Plan investments; and Defendants' processes for selecting and monitoring the Plan's RPS provider, i.e., USICG). For purposes of this Amended Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above and below.

B.    **Defendants**

24.    Defendant USI Insurance Services, LLC ("USI")[4] is a company with a principal place of business located at 100 Summit Lake Drive, Suite 400, Valhalla, New York 10595. Per the Plan's Forms 5500, USI is a Plan Administrator under 29 U.S.C. § 1002(16)(A)(i) and the Plan Sponsor under 29 U.S.C. § 1002(16)(B). As a Plan Administrator, USI is a fiduciary responsible for day-to-day administration and operation of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A). USI has responsibility and discretionary authority to control the operation, management, and administration of the Plan in accordance with 29 U.S.C. § 1102(a), with all powers necessary to enable it to carry out such responsibilities properly, including the selection and compensation of the providers of RPS to the Plan. USI acted through its officers, directors, and the other Defendants to perform Plan-related fiduciary functions in the course and scope of their business. USI appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary

---

[4] In this Amended Complaint, "USI" refers to the named Defendant USI and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

duty to monitor and supervise those appointees.

25.     Defendant Board of Directors of USI Insurance Services, LLC ("Board of Directors") is, on information and belief, located at 100 Summit Lake Drive, Suite 400, Valhalla, New York 10595. Per the Plan's publicly available Forms 5500, and on information and belief, the Board of Directors has authority to manage and control the administration and operation of the Plan. For example, the Plan's Forms 5500, Notes to Financial Statements,[5] clarify that the Board of Directors appoints the USI 401(k) Plan Committee and has the discretion to terminate the Plan. On information and belief, the Board of Directors and its members, in their individual capacities, exercised authority and control over Plan management and Plan assets since at least 2015, and thus are Plan fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A).

26.     Defendant USI 401(k) Plan Committee ("Committee") is, on information and belief, located at 100 Summit Lake Drive, Suite 400, Valhalla, New York 10595. The Committee and its members, in their individual capacities, are fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A). According to the Plan's Forms 5500, Notes to Financial Statements,[6] the Committee is also designated as Plan Administrator under 29 U.S.C. § 1002(16)(A)(i). As a Plan Administrator, the Committee is a fiduciary responsible for day-to-day administration and operation of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A). The Committee has responsibility and discretionary authority to control the operation, management, and administration of the Plan in accordance with 29 U.S.C. § 1102(a), with all powers necessary to enable it to carry out such responsibilities properly, including the selection and compensation of the providers of RPS to the Plan. The Committee acted through its individual committee members and the other Defendants to perform Plan-related fiduciary functions in the course and scope of its

---

[5] *See, e.g.*, ECF 34-7, p. 10.
[6] *Id.*

business. On information and belief, the Committee appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees.

27.     Defendants John and Jane Does 1-30 are unknown individuals comprising individual members of defendants the Board of Directors and the Committee; any officers, directors, or employees of defendant USI; or other individuals or entities who are or were fiduciaries to the Plan, within the meaning of 29 U.S.C. § 1002(21)(A), during the Class Period. Plaintiff reserves the right to seek leave to join these currently unknown individuals into the instant action once their identities are ascertained.

28.     All Defendants are Plan fiduciaries because they have exercised and continue to exercise discretionary authority or discretionary control respecting the management of the Plan and the management and disposition of its assets, and have discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. § 1002(21)(A).

## IV.     THE USI 401(k) PLAN

29.     The name of the Plan is the USI 401(k) Plan. The Plan's Employer Identification Number (EIN) is 13-3771734 and the Plan has been assigned the three-digit plan number 001.

30.     The Plan is subject to ERISA and is, on information and belief, established and maintained under written Plan documents in accordance with 29 U.S.C. § 1102(a)(1).

31.     USICG has been the Plan RPS provider since at least 2009, the first year Form 5500s are available on the DOL website.

## V.     ERISA'S FIDUCIARY STANDARDS

32.     ERISA imposes strict fiduciary duties of prudence and loyalty upon Defendants as fiduciaries of the Plan. 29 U.S. C. §1104(a)(1). The statute states, in relevant part:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A) for the exclusive purpose of

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan; [and]

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

33.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investment and service providers, must act prudently and for the exclusive benefit of the participants in the plan, and not for the benefit of third parties including service providers to the plan such as recordkeepers and those who provide investment products. Fiduciaries must ensure the amount of fees paid to those service providers is no more than reasonable. DOL Advisory Opinion 97-15A; DOL Advisory Opinion 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

34.     Fiduciaries must act "solely in the interest of the participants and beneficiaries" and with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope." 29 U.S.C. § 1104(a)(1) and (a)(1)(B). Fiduciaries have "a continuing duty to monitor trust investments and remove imprudent ones" within a reasonable time. *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015).

35.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by

another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
> >
> > (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

36.    29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## VI.    FACTUAL BACKGROUND

### A.    The Defined Contribution Plan Industry.

37.    In recent decades, the defined contribution plan has become the most common type of employer-sponsored retirement plan. The assets of a defined contribution plan are held by a trustee in a single trust.

38.    Each participant in a defined contribution plan has an individual account, and

directs their plan contributions into one or more investment options in a lineup chosen by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525.

39.     The majority of fees assessed to participants in a defined contribution plan are attributable to two general categories of services: plan administration (including recordkeeping), and investment management. These expenses "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.*

40.     The plan's fiduciaries have control over these expenses. The fiduciaries are responsible for hiring administrative service providers, such as a recordkeeper, and negotiating and approving those service providers' compensation. The fiduciaries also have exclusive control over the menu of investment options to which participants may direct the assets in their accounts. Those selections each have their own fees which are deducted from the returns that participants receive on their investments.

41.     These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the DOL, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in savings at retirement. DOL, *A Look at 401(k) Plan Fees,* at 1–2 (Aug. 2013).[7] Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for large plans like the Plan, which have the bargaining power to obtain the highest level of service and the lowest fees. The fees available to large retirement plans are orders of magnitude lower than the much higher retail fees

---

[7] *See* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

available to small investors.

42.     The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own higher-cost funds in plans and collecting the highest amount possible for recordkeeping. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, and reduce the plan's fees.

43.     Fiduciaries must be cognizant of providers' self-interest in maximizing fees, and not simply accede to the providers' preferred investment lineup-*i.e.*, proprietary funds that will generate substantial fee revenue for the provider—or agree to the provider's administrative fee quotes without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest, fiduciaries must negotiate as if their own money was at stake. Instead of simply accepting the investment funds or fees demanded by these conflicted providers, fiduciaries must consider whether participants would be better served by using alternative investment products or services.

44.     The potential for imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees and investment underperformance. Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments. But in a defined contribution plan, participants' benefits are limited to the value of their own investment accounts,

which is determined by the market performance of contributions, less expenses. Thus, in a defined contribution plan, risks related to high fees and poorly performing investments are borne by the participant.

45.     The table below illustrates how retirement plan services fees impact retirement accounts over time.[8] The table illustrates that when an employee invests $100,000 over 20 years with an assumed 4% annual rate of return and annual fees of 1.00%, the account balance in 20 years will be $180,000. This balance is $30,000 less than the same investment where annual fees are only 0.25%, which would result in a balance of $210,000. This difference of over 14 percent is substantial. In fact, the impact of excessive fees on defined contribution participants is even more substantial given that during most of the past three decades the returns of defined contribution participants have averaged almost double (7%) the 4% in the below SEC example (*see, e.g.*, Net Weighted Geometric Rate of Return of Defined Contribution Plans from 1990-2012 as calculated by the Center for Retirement Research at Boston College, *Investment Returns: Defined Benefit vs. Defined Contribution Plans* (December 2015, Number 15-21, p. 3, Table 4), https://crr.bc.edu/wp-content/uploads/2015/12/IB_15-211.pdf).

---

[8] *See Mutual Fund Fees and Expenses*, SECURITIES AND EXCHANGE COMMISSION OFFICE OF INVESTOR EDUCATION AND ADVOCACY (SEC Pub. No. 162 (5/14), https://www.sec.gov/files/ib_mutualfundfees.pdf.



**B.     Recordkeeping.**

46.     "Recordkeeping" is a catchall term for the entire suite of recordkeeping and related administrative services typically provided by a plan's service provider, or "recordkeeper."

47.     There are two types of essential recordkeeping and related administrative services provided by all national recordkeepers. For large plans with substantial bargaining power, like the Plan, the first type is provided as part of a "bundled" fee for a buffet-style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

     a.  Recordkeeping;

     b.  Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

     c.  Administrative services related to converting a plan from one recordkeeper to another;

     d.  Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

e.   Maintenance of an employer stock fund (if needed);

f.   Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.   Plan consulting services, including assistance in selecting the investment lineup offered to participants;

h.   Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s (excluding the separate fee charged by an independent third-party auditor);

i.   Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

j.   Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

48. This suite of essential recordkeeping services can be referred to as "Bundled Recordkeeping" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. Anyone who has passing familiarity with recordkeepers' responses to requests for proposals, their bids, and their contracts, understands and appreciates that the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services and any claim by Defendants that recordkeeping expenses depend upon the service level provided to a plan with respect to the above services is both false and frivolous. Nonetheless, as is all too often the case, when attempting to defend their malfeasance or nonfeasance with respect to recordkeeping fees, fiduciary-defendants often disingenuously assert that the cost of Bundled Recordkeeping services depend upon service level (even though such an assertion is plainly untrue based upon the actual marketplace for such services), as part of an attempt to perpetuate misunderstanding by the less informed in order to stave off breach of fiduciary duty claims.

49. The second type of essential recordkeeping services provided by all national recordkeepers can be referred to as "A La Carte" recordkeeping services and often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These services typically include the following:

   a. Loan processing;

   b. Brokerage services/account maintenance (if offered by the plan);

   c. Distribution services; and

   d. Processing of qualified domestic relations orders.

50. All national recordkeepers have the capability to provide all of the aforementioned services to all large defined contribution plans, including those much smaller than the Plan.

51. For large plans with greater than 5,000 participants, like the Plan, any minor variations in the way that these essential services are delivered have no material impact on the fees charged by recordkeepers to deliver the services. That fact is confirmed by the practice of all service providers quoting fees for the Bundled Recordkeeping services on a per-participant basis without regard for any individual differences in services requested–which are treated by the service providers as largely immaterial because they are, in fact, inconsequential to recordkeepers from a cost perspective.

52. Recordkeeping services are necessary for every defined contribution plan. Fiduciaries of virtually all large defined contribution plans hire one recordkeeper to provide the essential recordkeeping and administrative services for a plan. These services are largely commodities, and the market for recordkeeping services is highly competitive.

53.     Since the mid-2000s, the retirement plan services provided to large defined contribution plans, like the Plan, have increasingly become viewed by prudent plan fiduciaries as a commodity service. While recordkeepers in the defined contribution industry attempt to distinguish themselves through marketing and other means, most recordkeepers offer the same combinations of services as their competitors. As a result, the market for defined contribution retirement plan services is highly competitive, particularly for large plans that, like the Plan, have a sizable number of participants and a large amount of assets.

54.     In recent decades, the fee that recordkeepers have been willing to accept for providing retirement plan services has significantly decreased. Large recordkeepers view recordkeeping and administration as an opportunity to generate additional revenue through proprietary investment management, managed accounts, IRA rollovers and cross-selling retail financial products.

55.     Recordkeepers for larger defined contribution plans, like the Plan, experience advantages that lead to a reduction in the per-participant cost as the number of participants in the plan increases. This is because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans. When the number of participants in a defined contribution plan increases, the recordkeeper can spread the cost of providing retirement plan services over a larger participant base, reducing the average unit cost of delivering services on a per-participant basis.

56.     Moreover, the cost to a recordkeeper to provide services to a participant does not materially differ from one participant to another and is not dependent on the balance of the participant's account. The cost does not depend on the asset balance of the plan or the amount of

savings held in a participant's account. In other words, the average cost to provide recordkeeping and administrative services to a plan for a given participant is materially identical whether that participant has an average account balance of $10,000 or $100,000.

57.     Therefore, large plans, like the Plan, possess tremendous economies of scale for recordkeeping and administrative services, and wield enormous market power to insist upon the lowest level of fees for materially identical recordkeeping and administrative services. As the number of participants in the plan increases, the cost per participant to deliver the recordkeeping and administrative services decreases. Prudent plan fiduciaries and their consultants and advisors are aware of this cost structure dynamic for retirement plan providers.

58.     Some recordkeepers provide only recordkeeping and administrative services, while others provide both recordkeeping services and investment products. The latter has an incentive to place their own proprietary products in the plan in order to maximize revenues from servicing the plan. As explained below, when faced with such conflicted fund recommendations, fiduciaries must independently assess whether the provider's investment product is the best choice for the plan, or whether the purpose of providing benefits to participants would be better accomplished by considering other investment managers who may offer superior funds at a better price.

59.     Defined contribution fiduciaries determine the available investment options in a plan. Each investment option is typically a pooled investment product, such as a mutual fund, and invests in a diversified portfolio of securities in a broad asset class such as fixed income, bonds, or equities.

60.     Investment options can be passively or actively managed. In a passively managed or "index" fund, the investment manager attempts to match the performance of a given benchmark

index by holding a representative sample of securities in that index, such as the S&P 500. In an actively managed fund, the investment manager uses her judgment in buying and selling individual securities (*e.g.*, stocks, bonds, etc.) in an attempt to generate investment returns that surpass a benchmark index, net of fees. Because no stock selection or research is necessary for the manager to track the index and trading is limited, passively managed investments charge significantly lower fees than actively managed funds.

61.     Mutual fund fees are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the mutual fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points (bps).[9] The fees deducted from a mutual fund's assets reduce the value of the shares owned by fund investors.

62.     Many mutual funds offer their investors different share classes. Retail share classes are marketed to individuals with small amounts to invest. Institutional share classes are offered to investors with large amounts to invest, such as large retirement plans. The different share classes of a given mutual fund have the same manager, are managed identically, and invest in the same portfolio of securities. The only difference is that the retail shares charge significantly higher fees, resulting in retail-class investors receiving lower returns. The share classes are otherwise identical in all respects.

63.     Some mutual funds engage in a practice known as "revenue sharing." In a revenue-sharing arrangement, a mutual fund pays a portion of its expense ratio to the entity providing administrative and recordkeeping services to a plan, putatively as compensation for providing those services. The difference in fees between a mutual fund's retail and institutional share classes is often attributable to revenue sharing.

---

[9] ECF 32-1, p. 10

64.     For example, if a mutual fund has a total expense ratio fee of 0.75%, the mutual fund provider may agree to pay the recordkeeper 0.25% of the 0.75% total expense ratio fee that is paid by the investor in that mutual fund (in this context the Plan participant). That 0.25% portion of the 0.75% total expense ratio fee is known as the revenue sharing. The presence of revenue sharing thus provides an incentive for recordkeepers to recommend that the fiduciary select higher-cost funds, including in-house funds of the administrative service provider that pay the provider revenue sharing. "[V]ery little about the mutual fund industry," including revenue sharing practices, "can plausibly be described as transparent." *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 908 (7th Cir. 2013).

65.     In the context of defined contribution plans, the amount of revenue sharing is deemed to be the amount of revenue paid by participants that is allocable to retirement plan services and, in some cases, other services provided to a plan. The difference between the total expense ratio and the revenue sharing is known as the "net investment expense." When a plan adopts prudent and best practices, the net investment expense is the actual amount a plan participant pays for the investment management services provided by a portfolio manager.

66.     The importance of fees in prudent investment selection cannot be overstated. The prudent investor rule developed in the common law of trusts, which informs ERISA's fiduciary duties, emphasizes "the duty to avoid unwarranted costs[.]" Restatement (Third) of Trusts ch. 17, intro. note (2007); *see Tibble*, 575 U.S. at 529 (discussing Restatement (Third) of Trusts §90 in finding a continuing duty to monitor under ERISA). As the Restatement explains, "cost- conscious management is fundamental to prudence in the investment function." Restatement (Third) of Trusts § 90 cmt. b. While a fiduciary may consider higher-cost, actively managed mutual funds as an alternative to index funds, "active management strategies involve investigation expenses and

other transaction costs ... that must be considered, realistically, in relation to the likelihood of increased return from such strategies." Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2).

67.     Academic and financial industry literature demonstrates that high expenses are not correlated with superior investment management. As discussed in University of Pennsylvania's law review, numerous studies show that "the most consistent predictor of a fund's return to investors is the fund's expense ratio." Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010). Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2008). The empirical evidence shows that "low-quality funds charge higher fees," such that "[p]rice and quality thus appear to be *inversely related* in the market for actively managed mutual funds." *Id*. at 883. (emphasis added).

68.     In light of this effect of fees on expected returns, fiduciaries must carefully consider whether the added cost of actively managed funds is realistically justified by an expectation of higher returns. Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2). A prudent investor will not select higher-cost actively managed funds without analyzing whether a particular investment manager is likely to beat the overwhelming odds against outperforming its benchmark index over time, net of the fund's higher investment expenses.

## C.     Direct and Indirect Fees (Revenue Sharing).

69.     There are two primary methods for defined contribution plans to pay for recordkeeping and administrative services: "direct" payments from plan assets, and "indirect" revenue sharing payments from plan investments such as mutual funds. Plans may use one method

or the other exclusively, or may use some combination of both direct and indirect payments.

70.     In a typical direct--payment arrangement, the fiduciary contracts with the recordkeeper to obtain services in exchange for a flat annual fee based upon the number of participants for which the recordkeeper will be providing services, for example $30 per participant. Large defined contribution plans possess significant bargaining power due to the economies of scale for the purposes of recordkeeping and administrative fees and the minimal marginal cost of adding additional participants once the plan infrastructure is established. A plan with 20,000 participants can obtain a much lower fee on a per-participant basis than a plan with 2,000 participants.

71.     A recordkeeper's cost for providing services depends on the number of participants in the plan, not the amount of assets in the plan or in an individual account. The cost of recordkeeping a $75,000 account balance is the same as a $7,500 account. Accordingly, a flat price based on the number of participants in the plan ensures that the recordkeeper's compensation is (or should be) tied to the actual services provided and does not grow based on matters that have nothing to do with the services provided, such as an increase in plan assets due to market growth or greater plan contributions by the employee.

72.     Such a flat per-participant fee agreement does not necessarily mean, however, that every participant in the plan must pay the same $40 fee from his or her account. The fiduciary could reasonably determine that it is equitable to charge each participant the same $40 (for example, through a quarterly charge of $10.00 to each account in the plan). Alternatively, the fiduciary could conclude that assessing the same fee to all investors would discourage participants with relatively small accounts from participating in the plan, and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best. In that case,

the flat per-participant rate of $40 per participant multiplied by the number of participants would simply be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. For the $2 billion plan in this example, each participant would pay a direct administrative fee of 0.04% of her account balance annually for recordkeeping ($600,000/$2,000,000,000 = 0.0004). If plan assets increase thereafter, the percentage would be adjusted downward so that the plan is still paying the same $600,000 price that was negotiated at the plan level for services to be provided to the plan. Thus, in a prudently managed plan, the total fees paid by participants for recordkeeping and administrative services is capped and will remain proportional to the level of services provided by the recordkeeper, regardless of whether the participants pay those fees on a flat per-participant basis or as a percentage of account assets.

73.     Defendants have used both direct compensation and indirect, revenue sharing compensation as the method of paying the recordkeeper for the Plan. Revenue sharing, while not a *per se* violation of ERISA, can lead to excessive fees if not properly monitored and capped.

74.     In a revenue sharing arrangement, the mutual fund into which plan participants choose to invest pays the plan's recordkeeper putatively for providing recordkeeping and administrative services for the fund. However, because revenue sharing payments are asset based, the fees can grow to unreasonable levels if plan assets grow while the number of participants, and thus the services provided, has not increased at a similar rate. The opposite is generally not true. If plan assets decline, participants will not receive a sustained benefit of paying lower fees, because the recordkeeper will demand that the plan make up the shortfall through additional direct payments.

75.     Regardless of the pricing structure that the plan fiduciaries negotiate with the recordkeepers, the amount of compensation paid to the recordkeeper must be reasonable.

24

76.     As a result, plan fiduciaries must understand the total dollar amounts paid to their recordkeeper and be able to determine whether the compensation is reasonable by evaluating what the market is for the retirement plan services received by the plan.

## VII.  PRUDENT FIDUCIARY STANDARDS OF SELECTING AND MONITORING RECORDKEEPERS

77.     Plan fiduciaries are required to fully understand all sources of revenue paid to recordkeepers. Fiduciaries must regularly monitor the revenue paid to recordkeepers to ensure that the compensation received is and remains reasonable in view of the services provided.

78.     The DOL has identified that employers are held to a "high standard of care and diligence" and must, among other duties, "[e]stablish a prudent process for selecting . . . service providers"; "[e]nsure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided"; and "[m]onitor . . . service providers once selected to make sure they continue to be appropriate choices."[10]

79.     The duty to evaluate and monitor plan service provider fees includes those fees directly paid by participants, because "[a]ny costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants."[11]

80.     Prudent fiduciaries will ensure that a plan is paying reasonable recordkeeping and administrative services fees by soliciting competitive bids from other recordkeepers to perform the same services currently provided to the plan. This process is not difficult or complex and is performed regularly by prudent plan fiduciaries. For plans with many participants, like the Plan, most recordkeepers would require only the number of participants and the amount of the assets to

---

[10] *See* DOL, *A Look at 401(k) Plan Fees*, at 2, *supra*.
[11] Investment Company Institute, *The Economics of Providing 401(k) Plans: Service, Fees, and Expenses*, at 4-5 (June 2018), https://www.ici.org/pdf/per24-04.pdf.

provide a quote for fees, while others might only require the number of participants.

81.     Prudent fiduciaries have all of this information readily available and can easily receive a quote from other recordkeepers to determine if the current level of fees charged to the plan is reasonable.

82.     Having received competing bids, a prudent fiduciary can negotiate with its current provider for a lower fee or move to a new recordkeeper to provide the same services for a competitive (or lower) reasonable fee. Prudent fiduciaries follow this same process on a regular basis to monitor the fees of retirement plan advisors and/or consultants as well as any other covered service providers.

83.     After the revenue requirement is negotiated, the plan fiduciary determines how to pay the negotiated recordkeeping and administrative services fees. The employer/plan sponsor can pay the fees on behalf of participants, which is the most beneficial to plan participants. If the employer were paying the fee, the employer would have an interest in negotiating the lowest fee a suitable recordkeeping provider would accept. Typically, however, the employer decides to have the plan (i.e., participants) pay the recordkeeping and administrative fees. If the fees are paid by participants, the fiduciaries can allocate the negotiated fees among participant accounts at the negotiated per-participant rate, or pro rata based on account values, among other less common ways.

84.     In other words, if a plan negotiates a per-participant revenue threshold, e.g., $40.00, the plan does not need to require that each participant pay $40.00. Rather, the fiduciaries could determine that an asset-based fee is more appropriate for participants and allocate the fees pro rata to participants. For example, a 10,000-participant plan with a $40.00 revenue threshold would pay $400,000 in fees. If the Plan had $400,000,000 in assets, then the $400,000 would work out to 10

basis points. Accordingly, the Plan could allocate the $400,000 in fees to participants by requiring that each participant pay 10 basis points.

85.     Because revenue sharing arrangements provide indirect, asset-based compensation for the recordkeeper – recordkeeping expense calculated as a percentage of total plan assets – prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper's compensation is reasonable based upon the services provided. A prudent fiduciary must ensure that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable, negotiated recordkeeping fee.

86.     In such an asset-based pricing structure, since the amount of compensation received by the recordkeeper is based on a percentage of the total assets in the plan, this structure creates situations in which the services provided by the recordkeeper do not change but, because of market appreciation and contributions to the plan, the revenue received by the recordkeeper increases.

87.     Moreover, because revenue sharing payments are asset based, they bear no relation to the actual cost to provide reasonable recordkeeping and administrative services and can result in payment of unreasonable fees.

88.     By 2013, prior to the Class Period, the impact of the 2012 Fee Disclosure regulations was incorporated into the standard of care and was well known, understood, and established among prudent plan fiduciaries based on the DOL guidelines, case law, and best practices as shared by retirement plan professionals. For example, in its 2013 publication titled *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance*, Mercer LLC summarized the standard of care exercised by prudent retirement plan professionals and plan fiduciaries as follows:

1. Price administrative fees on a per-participant basis.
2. Benchmark and negotiate recordkeeping and investment fees separately.

3. Benchmark and negotiate investment fees regularly, considering both fund vehicle and asset size.
4. Benchmark and negotiate recordkeeping and trustee fees at least every other year.
5. Negotiate vendor contracts to ensure that service standards and liability provisions are in the best interests of plan participants and beneficiaries.
6. Monitor actual fees paid against contractual requirements.
7. Review services annually to identify opportunities to reduce administrative costs.[12]

89.     If a fiduciary decides to use revenue sharing to pay for recordkeeping, prudent fiduciaries: (a) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has received, (b) compare that amount to the price that would be available on a flat per-participant basis, and (c) control the amount of fees paid through recordkeeping by obtaining rebates of any revenue sharing amounts that exceed the reasonable level of fees.

90.     First, fiduciaries must pay close attention to the recordkeeping and administrative services fees paid by the plan. A prudent fiduciary monitors the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports. This would include information from all revenue, not just retirement plan services revenue, generated by providers through their relationship with the plan.

91.     To make an informed evaluation as to whether a recordkeeper is receiving a reasonable fee for the services provided to the plan, a prudent fiduciary must identify all fees,

---

[12] *DC Fee Management — Mitigating Fiduciary Risk and Maximizing Plan Performance*, Mercer LLC, at 3-4 (2013),
https://www.mercer.com/content/dam/mercer/attachments/global/Retirement/DC%20Fee%20Managemen t%20-%20Mitigating%20Fiduciary%20Risk%20and%20Maximizing%20Plan%20Performance.pdf.

including direct compensation and indirect revenue sharing, paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries must monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels.

92.    Second, in determining the price that would be available for recordkeeping and administrative services on a flat per-participant basis, prudent fiduciaries making such an assessment for a large plan recognize that it is necessary to solicit bids from competing providers. In large plans with thousands of participants, such as the Plan, benchmarking based on fee surveys alone is inadequate. Recordkeeping fees for large plans have declined significantly in recent years due to increased technological efficiency, competition, and increased attention to fees by sponsors of other plans such that fees that may have been reasonable at one time may have become excessive based on current market conditions. Accordingly, the only way to determine the true market price at a given time is to obtain a competitive bid. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (a 401(k) excessive fee case which denied summary judgment based in part on the opinion of an independent consultant that "without an actual fee quote comparison – i.e., a bid from another service provider – [consultant] could not comment on the competitiveness of [recordkeeper's] fee amount for the services provided") (internal quotes omitted.).

93.    Best practices dictate that conducting a competitive bidding process, called a request for proposal ("RFP"), must be done at reasonable intervals, but at least once every three to five years. However, plan fiduciaries can quickly and easily gain an understanding of the current market for materially identical retirement plan services and determine a starting point for negotiation without a formal RFP by merely soliciting bids from other recordkeepers. Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids through

some process, be it formal or informal, that provides an incentive to recordkeepers to provide a competitive bid.

94.     Third, a prudent fiduciary must require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

95.     All of these standards are accepted and understood by prudent plan fiduciaries and were, or should have been, understood by Defendants at all times during the Class Period. This is because prudent fiduciaries understand that excessive fees significantly impact the value of participants' retirement accounts.

## VII.   DEFENDANTS BREACHED THEIR FIDICIARY DUTIES

### A.   Defendants Imprudently Permitted the Plan to Pay Excessive and Unreasonable Recordkeeping and Administrative Fees.

95.     USI contracted with its wholly-owned subsidiary, USICG, to be the Plan's administrative services provider. USICG was responsible for holding the Plan's assets in trust, tracking contributions, earnings and investments for the participants' accounts, and executing trades requested by Plan participants.

96.     USI disclosed to Plan participants that they were each paying $24.50 per quarter ($90 per year) for "the multitude of administrative and recordkeeping services USICG provides participants, including contribution processing, distributions and transactions, trustee and custodial services, statement preparation, online account access, customer service, and much more."[13]

97.     Notably, USI did not identify "pension consulting" or "appraisal" as services it provided to the Plan in its participant disclosures.

98.     Plaintiff and other Plan participants received or had access to the following Plan

---

[13] ECF 32-22, p. 2.

services from USICG: Internet access to their accounts through the Plan website maintained by USICG; transaction processing (buying and selling Plan investments); quarterly participant statements setting out their current account balances and transactions; participant communications, including Plan investment disclosures; and telephone support to answer questions or give assistance to Plan participants.

99.     In addition to the $90 per participant per year for recordkeeping and administrative services, USI disclosed to participants that it was charging an additional 1.5 basis points (0.015%) of participants' account balances for "services to design and maintain a compliant investment infrastructure including ongoing Investment Policy Statement maintenance, regular visits with the investment committee; review of investments versus policy, investment monitoring and reporting, and investment option due diligence, review and recommendations."[14]

100.     None of the services provided to the Plan by USICG are unique or even uncommon in the marketplace, and any of those services would be readily available through any other reputable recordkeeper.

101.     During the Class Period, USICG charged the Plan direct fees that were excessive relative to the type and quality of the services received by the Plan when benchmarked against other similar-sized plans for similar recordkeeping and administrative services. These excessive fees led to lower net returns, eating into and substantially reducing Plaintiff's and Plan participants' retirement savings.

102.     Annual returns on Form 5500s provide substantial evidence of the Plan's imprudence. Form 5500s are essentially the Plan's annual tax returns. DOL rules expressly require that plan service providers report all direct and indirect compensation received for the year in

---

[14] *Id.*

connection with those services.

103.    USICG charged a direct fee for its recordkeeping and administrative services that was paid by participants through deductions from their accounts. As shown in the Table below, during the Class Period, Plaintiff and Plan participants each paid direct recordkeeping and administrative fees of between $79 and $152 per year, for an average of $101 per year:

| | Direct Recordkeeping and Administrative Services Compensation Per-Participant Cost (source: Forms 5500) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Plan Year Ended 12/31 | | | | | | |
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | *Average* |
| Participants | 5,394 | 5,427 | 8,145 | 8,883 | 9,867 | 10,898 | **8,102** |
| | | | | | | | |
| Plan Assets | $423,713,173 | $457,004,294 | $544,769,481 | $662,334,339 | $847,803,295 | $1,038,646,364 | |
| | | | | | | | |
| Direct Fees | $757,866 | $827,497 | $ 888,775 | $ 705,235 | $ 881,681 | $857,399 | **$819,742** |
| | | | | | | | |
| **Per-Participant Fee** | $ 140 | $152 | $109 | $79 | $89 | $79 | **$101** |

104.    In addition to the direct compensation described above, USICG also disclosed in the Plan's Form 5500s for 2015 through 2020 that it received indirect compensation (i.e., revenue sharing) from mutual fund managers in the form of sub-transfer agency fees, finder's and placement fees, and distribution (12b-1) fees. Plaintiff calculated indirect compensation paid by the Plan's investment options by reviewing the investments listed in Schedule H, Part IV, Line 4(i) of Form 5500s, reviewing Schedule C, Part I, Line 3 to see if any revenue sharing rates were disclosed, using prospectuses for the Plan's mutual funds that disclose revenue sharing rates to determine the appropriate revenue sharing rate for each investment option and other publicly available sources, then multiplying the year-end assets for each investment option from Schedule H by the appropriate revenue sharing rate to determine the total amount of indirect compensation

received by USICG:

| | Plan Year | | | | | |
|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
| Participants | 5,394 | 5,427 | 8,145 | 8,883 | 9,867 | 10,898 |
| | | | | | | |
| Indirect Fees | $9,483 | $10,615 | $14,992 | $15,419 | $19,092 | $23,269 |

    105.    Altogether, USICG was paid the following total fees for RPS services by the Plan:

| Total Direct and Indirect Recordkeeping and Administrative Services Compensation Per-Participant Cost (source: Forms 5500) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Plan Year Ended 12/31 | | | | | | | |
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | *Average* |
| Participants | 5,394 | 5,427 | 8,145 | 8,883 | 9,867 | 10,898 | **8,102** |
| | | | | | | | |
| Direct Fees | $757,866 | $827,497 | $ 888,775 | $ 705,235 | $ 881,681 | $857,399 | **$819,742** |
| | | | | | | | |
| Indirect Fees | $9,483 | $10,615 | $14,992 | $15,419 | $19,092 | $23,269 | **$15,478** |
| | | | | | | | |
| **Total Fees** | $767,349 | $838,112 | $903,767 | $720,654 | $900,773 | $880,668 | **$835,221** |
| | | | | | | | |
| **Per-Participant Fee** | $ 142 | $154 | $111 | $81 | $91 | $81 | **$103** |

    106.    The Plan's fees were also excessive and unreasonable compared to other defined contribution plans of comparable size on a per-participant basis. The DOL encourages plan sponsors to "[a]sk each prospective provider to be specific about which services are covered for the estimated fees and which are not. Compare the information you receive, **including fees and expenses to be charged by the various providers for similar services**."[15] (Emphasis added).

---

[15] *See* DOL, *Getting It Right Know Your Fiduciary Responsibilities*, ¶ 5,

Although the DOL notes that cost is only one factor to be considered when selecting a recordkeeper, and a plan sponsor is not required to pick the least costly provider, "the law … does require that fees charged to a plan be 'reasonable.'"[16]

107.    Given the Plan's size and negotiating power, with prudent management and administration, the Plan should unquestionably have been able to obtain recordkeeping and administrative services for significantly lower rates than the above per-participant amounts. A reasonable rate for USICG's services, based on what other similar plans paid USICG and other national retirement services providers for the same or superior services, would have been $40 per participant per year during the Class Period. Had the Defendants followed the guidance of the DOL, they could have easily determined it was not reasonable for the Plan to pay average recordkeeping and administrative fees to USICG in excess of an average of $103 per participant per year.

108.    Because the level of fees that recordkeepers have been willing to accept for providing retirement plan services, including recordkeeping and administrative services, has stabilized, and has not materially changed during the Class Period, reasonable recordkeeping and administrative fees paid in 2018 are representative of the reasonable fees for retirement plan services during the entire Class Period. The Table below illustrates a comparison of the annual per-participant recordkeeping and administrative services fees paid in 2018 by other comparable plans in contrast to that paid by the Plan. The plans provide a reasonable benchmark to the Plan, yet they paid total fees (direct and indirect) that were far lower than the fees paid by the Plan for

---

https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/tips-for-selecting-and-monitoring-service-providers.pdf.
[16] *See* DOL, *Meeting Your Fiduciary Responsibilities*, at 6,
https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

RPS services that were far lower than the fees paid by the Plan:[17]

| Plan | RPS Provider | Service Codes | Participants | Assets | RPS Price | Price/PP |
|------|------|------|------|------|------|------|
| Healthfirst Profit Sharing 401(K) Plan | Vanguard | 15, 16, 25, 26, 33, 37, 52 | 4,950 | $234,755,239 | $201,889 | $41 |
| Sound Physicians 401(k) Plan | USICG | 15, 26, 27, 37, 50, 51 | 4,970 | $218,520,017 | $161,083 | $32 |
| Genesis Health System Retirement Savings Plan | Transamerica | 12, 15, 28, 37, 38, 50, 54, 59, 61, 62, 63, 64, 65 | 6,260 | $231,793,794 | $325,894 | $52 |
| Flowserve Corporation Retirement Savings Plan | T. Rowe Price | 15, 21, 25, 28, 33, 37, 38, 49, 50, 52, 55, 59, 62, 64, 65, 71 | 6,395 | $892,435,613 | $263,380 | $41 |
| St. Luke's Health Network 403(B) Plan | Transamerica | 12, 15, 28, 37, 38, 54, 59, 61, 62, 63, 64, 65 | 7,142 | $241,600,647 | $333,578 | $47 |
| Memorial Health System Defined Contribution Retirement Savings Plan | Transamerica | 12, 15, 28, 37, 38, 50, 54, 59, 61, 62, 63, 64, 65 | 7,318 | $221,242,194 | $385,754 | $53 |
| The Boston Consulting Group, Inc. Employees' Savings Plan And Profit Sharing Retirement | Vanguard | 15, 25, 37, 52 | 8,067 | $894,454,060 | $336,660 | $42 |
| Carlisle, LLC Employee Incentive Plan | Wells Fargo | 15, 37, 50, 62 | 8,465 | $539,303,700 | $348,150 | $41 |

[17] Plaintiff calculated direct compensation using Schedule C of Form 5500 and the notes attached to the Audited Financial Statements. Plaintiff calculated indirect compensation by reviewing the investments listed in Schedule H, Part IV, Line 4(i) of Form 5500, reviewing Schedule C, Part I, Line 3 to see if any revenue sharing rates were disclosed, using prospectuses for the plan's mutual funds that disclose revenue sharing rates and other publicly available sources to determine the appropriate revenue sharing rate for each investment option, then multiplying the year-end assets for each investment option from Schedule H by the appropriate revenue sharing rate to determine the total amount of indirect compensation. Plaintiff also reviewed the notes to the Audited Financial Statements attachment to Form 5500 to determine additional information about the Plan's pricing structure and whether any revenue sharing was allocated back to the Plan and/or plan participants. Sound Physicians and Eurofins did not pay indirect compensation through revenue sharing.

| | | | | | |
|---|---|---|---|---|---|
| USI Distribution, Inc. Retirement Savings Plan (2018) | USICG | 12, 15, 17, 25, 34, 37, 57, 60, 61, 63, 64, 65 | 8,883 | $662,334,339 | $720,654 | $81 |
| Children's Medical Center Of Dallas Employee Savings Plan 403(B) | Fidelity[18] | 37, 38, 50, 60, 64, 65 | 9,356 | $349,335,673 | $337,416 | $36 |
| Ralph Lauren Corporation 401(K) Plan | T. Rowe Price | 15, 21, 25, 28, 33, 37, 38, 49, 50, 52, 55, 57, 59, 62, 64, 65 | 9,389 | $552,586,935 | $290,066 | $31 |
| Edward- Elmhurst Healthcare Retirement Savings Plan | Fidelity | 37, 60, 64, 65, 71 | 10,263 | $618,238,970 | $446,836 | $44 |
| Eurofins Scientific, Inc. 401(k) Incentive Savings Plan | Conrad Siegal | 15, 17, 37, 38, 49, 50 | 11,412 | $447,255,399 | $466,908 | $41 |
| Jeld-Wen 401(K) Retirement Savings Plan | Wells Fargo | 15, 21, 37, 50, 62, 64 | 12,668 | $280,294,753 | $477,797 | $37 |
| Fortive Retirement Savings Plan | Fidelity | 37, 64, 65, 71 | 13,502 | $1,297,404,611 | $472,673 | $35 |

109.     The table above is an apples-to-apples comparison of total cost (both direct and indirect fees) and per-participant cost between the Plan and the other plans using national retirement plan service providers. In 2018, Fidelity and Vanguard were two of the top recordkeepers by number of plans for plans with assets in excess of $200 million (the highest asset amount); Wells Fargo was fourth, T. Rowe Price was tied for fifth and Voya was tenth.[19] By contrast, even by 2020, the USI Plan is one of only two defined contribution plans with assets in

---

[18] In *Moitoso v. FMR LLC*, 451 F.Supp.3d 189, 214 (D. Mass 2020), Fidelity stipulated that the value of its recordkeeping services for plans with over $1 billion in assets would range from $14 to $21 per person per year.

[19] 2019 Recordkeeping Survey, PLANSPONSOR (July 18, 2019), https://www.plansponsor.com/research/2019-recordkeeping-survey/?pagesec=9#topTotal%20401(k)%20Plans%20with%20%3E$200MM%3Csup%3E%E2%80%A0%3C/sup%3E%20in%20Assets.

excess of $400 million and the only plan with over $500 million administered by USICG. Given that all of the major providers listed above were competing more successfully than USICG for the same large plan defined contribution business, it is plausible to infer that the other providers are offering the same or superior services compared to those offered by USICG.

110.   The graph below summarizes the average annual RPS fee paid by the Plan compared to the effective annual per participant RPS fee paid by the plans identified in the tables in Paragraph 108 above, with the black data points showing the RPS fees paid to other RPS providers by comparable Plans for the materially identical level of services. Based on the chart and the graph, a reasonable fee for the USI Plan would have been $40 per participant per year.



111.   During the Class Period, Fidelity, Vanguard, T. Rowe Price, Voya and Transamerica all provided the same or superior services to the comparator plans as those provided by USICG to the Plan, including: Holding plan assets in trust; tracking contributions, earnings and

investments for the  participants' accounts; executing trades requested by plan participants; Internet access to accounts through the plan websites maintained by the recordkeeper; transaction processing (buying and selling plan investments); quarterly participant statements; participant communications, including plan investment disclosures and periodic participant newsletters; retirement education services, including various tools such as retirement income calculators available on the plan websites; telephone support to answer questions or give assistance to plan participants; and a brokerage window that allowed plan participants to invest in securities that were not plan investment options.

112.    The USI Plan contains less than 12% of the total number of plan participants for all defined contribution plans administered by USICG (for plans with greater than 100 eligible employees) but the direct compensation charged to the USI Plan accounts for almost 20% of all direct compensation received by USICG for defined contribution plan recordkeeping services for plans with greater than 100 eligible employees. USICG's second largest client in terms of the number of participants is Sound Physicians, a plan with almost 50% fewer participants and 65% less in assets than the USI Plan. USICG charged Sound Physicians total fees of $32 per participant for the same or more services for which USICG charged the Plan $81 per participant. Although it was the second largest plan administered by USICG and accounted for 6% of USICG's total plan participants (based on plans with greater than 100 eligible employees), Sound Physicians accounted for only 1% of the direct compensation paid to USI for recordkeeping. In effect, USICG is using the fees from its own Plan to subsidize its defined contribution recordkeeping business for its other clients.

113.    Wells Fargo Bank, the RPS provider for the Jeld-Wen and Carlisle plans, was the Plan's custodian between 2015 and 2020 according to the Notes to Financial Statements attached

to the Plan's Form 5500s for those years.[20] As set forth above, Wells Fargo was the fourth largest service provider for plans with over $200 million in assets. Had the Plan used Wells Fargo as its RPS provider instead of USICG, it could have paid RPS fees of between $37 (Jeld-Wen) and $41 (Carlisle)[21] per participant instead of the $81 per participant it paid to USICG for the same or superior services.

114.    The validity of Plaintiffs' comparisons above is confirmed by retirement consulting group NEPC in its 14th Annual Survey, the NEPC 2019 Defined Contribution Progress Report (the "Report"), which surveyed various defined contribution plan fees as of December 31, 2018. *See* Report at 1.[22] The sample included 121 Defined Contribution Plans, 71% of which were corporate plans like the Plan. The median plan had $512 million in assets and 5,440 participants. *Id*. The NEPC survey found that the range of total RPS fees for plans with between 5,000 and 10,000 participants (the same size category as the Plan) was between $40 and $60 per participant as of December 31, 2018, and no plan in that range paid more than $81 per participant in total fees. *Id*. at 10.

115.    The graph in Paragraph 110, together with the NEPC Survey, establishes a reasonable benchmark for retirement plan services fees for the Plan – a reasonable fee for retirement plan services for the Plan would have been $40 per participant, not the $81 per participant paid by the Plan.

---

[20] ECF 34-2 to ECF 34-7.

[21] The Form 5500s for both the Jeld-Wen and the Carlisle plans contain the same service codes denoting the services ostensibly provided by Wells Fargo (codes 15, 37, 50, and 62), but the Jeld-Wen plan lists additional service codes that are not listed for the Carlisle plan (codes 21 and 64), despite the fact that the per-participant cost charged to the Jeld-Wen plan was $4 less than the same RPS provider charged to the Carlisle plan. This further shows the service codes listed on the Form 5500s are not indicative of any meaningful differences in the services actually provided to the plans.

[22] *See* NEPC 2019 Defined Contribution Progress Report, https://cdn2.hubspot.net/hubfs/2529352/2019%20DC%20Plan%20and%20Fee%20Survey%20(progress %20report)/2019%20NEPC%20DC%20Plan%20Progress%20Report.pdf.

**B.** **The Nature and Quality of USICG's Services Did Not Justify Charging the Plan Two Times the Reasonable Rate for Its Services.**

114.    For large plans with greater than 5,000 participants, like the Plan, any minor variations in the way that these essential services are delivered have no material impact on the fees charged by recordkeepers to deliver the services.

115.    The Plan paid USICG for the following disclosed services: "Contribution processing, distributions and transactions, trustee and custodial services, statement preparation, online account access, customer service, and much more."[23] All major providers listed on the chart in Paragraph 108 above provide the same or superior services.[24]

116.    Under Section 2(b) of Schedule C, Service Provider Information, of Form 5500, there is a box to provide service codes describing services provided to the plan. The instructions state: "Select from the list below all codes that describe both the kind of services provided and the type of compensation received. Enter as many codes as apply."[25]

117.    Because service codes are entered at the discretion of the service provider, the service codes are not a reliable indicator of the actual services provided because different RPS providers have different practices regarding listing service codes on Form 5500s. For example, Fidelity is one of the largest RPS providers for plans over $200 million and provides the full range

---

[23] ECF 32-22, p. 2

[24] The level and quality of services provided are factual questions that cannot be determined at the pleading stage. *See, e.g.*, *Kong et. al. v. Trader Joe's Co.*, No. 20-56415, 2022 WL 1125667, at *1 (9th Cir. Apr. 15, 2022) ("Defendants' explanation for the more expensive choice is unavailing at the pleading stage."); *Carrigan v. Xerox Corp.*, No. 3:21-CV-1085 (SVN), 2022 WL 1137230, at *8 (D. Conn. Apr. 18, 2022) ("Plaintiffs' general allegations that the comparator recordkeepers would have provided services 'of like or superior quality' to the affiliated recordkeepers, as well as Plaintiffs' suggestion that recordkeeping services are fairly standardized, support their claim that the fees charged by the affiliated recordkeepers were excessive."); *Khan v. Bd. of Directors of Pentegra Defined Contribution Plan*, No. 20-CV-07561 (PMH), 2022 WL 861640, at *7 (S.D.N.Y. Mar. 23, 2022) ("Court cannot conclude that the pleading contains insufficient benchmarks for a meaningful comparison of fees at this stage of the proceedings, where such a conclusion evidently requires the Court to resolve fact disputes.")

[25] ECF 32-9, p. 6. There are no additional instructions or guidelines for entering service codes.

of recordkeeping and administrative services for those plans as described in Paragraph 111. However, as can be seen on the chart in Paragraph 108, Fidelity lists a single service code, 37 (Loan Processing), which does not cover the full range of services provided to plans by Fidelity.[26]

118.    On the Plan Form 5500s (which USICG prepared for the Plan) USICG listed six service codes and six payment codes: 12 (Claims processing); 15 (Recordkeeping and information management (computing, tabulating, data processing, etc.)); 17 (Consulting (pension)); 25 (Trustee (directed)); 34 (Valuation (appraisals etc.)); 37 (Participant loan processing); 60 (Sub-transfer agency fees); 61 (Finders' fees/placement fees); 62 (Float revenue); 63 (Distribution (12b-1) fees); 64 (Recordkeeping fees); and 65 (Account maintenance fees). Notably, the Plan's Form 5500 does not include Service Code 27, Investment Advisory (Plan) even though participants were charged a separate fee of 0.015% of their account balance for those services.[27]

119.    Consulting (general) (Code 16) and pension consulting (Code 17) services include plan management services, regulatory and compliance services, fiduciary training, plan operations and document review, plan design, employee communication, education and advice.[28] These services are provided by all large providers, including Fidelity, Vanguard, T. Rowe Price, Wells Fargo, Transamerica, and Voya.

120.    The recordkeepers of two of the comparable plans, Healthfirst and Eurofins, identified general (16) or pension (17) consulting as part of their plan administrative services, but Healthfirst and Eurofins each paid $41 per participant for RPS services, one-half the per-

---

[26] Fidelity does not list Service Code 15, Recordkeeping. Fidelity also lists compensation.
[27] ECF 32-22, p. 2.
[28] USI Advisors' Form ADV-Part 2A filed with the Securities and Exchange Commission, https://www.usiadvisorsinc.com/ADV/ADV%20Part%202A%20-%203.2022%20(Annual%20Update).pdf. It is likely that USICG put Code 17 (pension consulting) rather than the more appropriate Code 16 (consulting) because its practice focuses on defined benefit plans rather than defined contribution plans.

participant fee charged to the Plan by USICG. Thus, the "pension consulting services" provided by USICG to the Plan alone do not justify a per-participant fee of two times that charged by other RPS providers for the same services.

121.   Valuations (appraisals) (Code 34) is another service provided by all RPS providers as part of their recordkeeping for defined contribution plans. Unlike a defined benefit plan, where an appraisal of a pension fund's assets versus liabilities must be performed to determine the funded status of the plan, no such calculation is necessary for a defined contribution plan.[29] In a defined contribution plan, plan assets are valued at fair market value because the benefit to which a participant is entitled is limited to the benefit that can be provided from the participant's account. Generally, the market value of mutual funds and other investments are provided to the recordkeeper by the investment managers for the funds. RPS providers make that information available to plan participants by daily updating the market price (and value) of the participant's account so that at any given time a participant can log into their account and check the market value of their investments.

122.   USICG's participant fee disclosure makes no mention of any "valuation" or "appraisal" services or fees. According to Schedule H of the Plan's Form 5500s, the Plan's assets consist of investments in mutual funds managed by various mutual fund companies, a guaranteed income fund managed by an insurance company, and a money market fund managed by Pioneer Investments. There are no assets that need to be independently appraised by USICG, such as real estate or non-publicly traded company stock. As disclosed in the Plan's Form 5500s, the

---

[29]USICG's website claims it provides services to over 1,000 defined benefit plans. https://www.usicg.com/retirement-plan-services/defined-benefit/ (last visited May 19, 2022). USICG's **defined benefit** plan services include "core actuarial services" and "actuarial evaluations." https://www.usicg.com/retirement-plan-services/defined-benefit/actuarial/ (last visited May 19, 2022).

information regarding the market value of the Plan investments were provided to USICG by each mutual fund manager, not through an independent appraisal or valuation by USICG. Similarly, the value of the guaranteed income fund was provided by the manager of the fund, Prudential Insurance, not through an independent appraisal or valuation by USICG. Thus, the "valuation (appraisal)" service ostensibly provided by USICG to the Plan consists of nothing more than collecting market values of the Plan investments from other sources, something every recordkeeper for a defined contribution plan does, and adds no value.

123.    USICG did not offer any services to the Plan that were unique or of such markedly different quality so as to justify paying twice the reasonable rate for those services. The same bundle of services provided to the Plan by USICG could easily and readily have been provided at a much lower per-participant cost by any number of other reputable RPS providers. The "valuation (appraisal)" service has no value and does not justify a per-participant fee nearly twice that charged by other RPS providers for the same services.

124.    The Plan's recordkeeper fees were "so disproportionately large that [the fee] bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining[.]"[30]   USICG did not offer any services to the Plan that were so unique or of such markedly higher quality so as to justify paying twice the reasonable RPS rate for those services.

125.    Defendants acted imprudently by allowing USICG to collect unreasonable fees through both direct and indirect asset-based fees without negotiating a reasonable per-participant cap on the fees. As a result of Defendants' failure to prudently negotiate and monitor the fees, the Plan paid USICG twice the reasonable fee for its services from 2015 through 2020.

---

[30] *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009).

126.    Defendants acted imprudently by failing to investigate whether the services offered by other service providers were of the same or higher quality as those offered by USICG. It was Defendants' responsibility as Plan fiduciaries to balance the quality of the services with their cost and act in the best interests of the Plan and its participants. If similar services were available at one-half the cost of USICG's services, Defendants were obligated to consider that and weigh whether any (marginal) increase in service quality was worth the expense.

127.    Defendants acted imprudently by allowing the Plan to pay twice the reasonable rate even if USICG's services were somehow perceived to be different or superior to those of the other providers (they were not).

128.    Defendants acted imprudently by failing to monitor USICG's fees to assure they were reasonable for a plan the size of the Plan. Had Defendants appropriately monitored the compensation paid to USICG and ensured that participants were only charged reasonable recordkeeping fees, Plan participants would not have lost millions of dollars in their retirement savings over the last six-plus years.

129.    Defendants acted imprudently by paying USICG twice the reasonable cost of recordkeeping and administrative services regardless of the quality of those services. The Plan's recordkeeper fees were so disproportionately large that the fee bears no reasonable relationship to the services rendered and could not have been the result of an arm's length negotiation or prudent fiduciary process.

130.    Defendants acted imprudently by failing to conduct an RFP process or otherwise obtain comparative quotes from other service providers from at least 2009 through 2020 in order to determine if another recordkeeper could provide more competitive rates for recordkeeping and administrative services or to be able to negotiate with USICG to reduce the fees it charged the Plan

for recordkeeping and administrative services. Had Defendants conducted an RFP for recordkeeping services, they would have learned (as demonstrated by the tables above) that USICG and other national service providers offered the same or superior recordkeeping and administrative services provided to the Plan by USICG for about one-half what the Plan paid in total fees to USICG.

131.     Defendants acted imprudently by failing to leverage the Plan's size to obtain recordkeeping and administrative services for significantly lower fees than the amounts paid by the Plan.

132.     Defendants acted imprudently by failing to recognize that the Plan and its participants were grossly overcharged for retirement plan services and by failing to take effective remedial actions.

133.     Defendants acted imprudently by continuing to use USICG as the Plan services provider based on their unsubstantiated belief that USICG offered superior services without considering whether USICG's fees were reasonable.

134.     Defendants acted disloyally by retaining the wholly-owned subsidiary of Plan sponsor USI as the recordkeeper, then paying USICG an unreasonable fee for its services without making any effort to determine whether the same or superior services were available for a lower per-participant fee. By its actions and failure to act, USI enriched itself at the expense of the Plan participant.

135.     Defendants acted disloyally by charging the Plan disproportionately large fees in order to subsidize the lower fees paid to USICG by its other defined contribution plan RPS clients.

136.     Based on the excessive fees paid by the Plan compared to other large plans receiving the same (or superior) recordkeeping and administrative services, one of which used

USICG as its service provider, it is reasonable to infer that the Plan fiduciaries failed to follow a prudent process to ensure that the Plan was paying only reasonable fees.

137.    Based on the amounts the Plan paid to USICG throughout the Class Period, Defendants clearly either engaged in virtually no examination, comparison, or benchmarking of the recordkeeping and administrative fees of the Plan to those of other similarly-sized defined contribution plans, or were complicit in paying grossly excessive fees.

138.    Defendants' actions evidence their failure to have or follow a prudent process to evaluate, negotiate and/or monitor the Plan fees paid to USICG; this failure constitutes a breach of their fiduciary duties to the Plan. To the extent Defendants had a process in place, it was imprudent and ineffective given the objectively unreasonable level of fees the Plan paid for recordkeeping and administrative services.

139.    Defendants' failure to recognize that the Plan and its participants were grossly overcharged for retirement plan services and their failure to take effective remedial actions amounts to a breach of their fiduciary duties to the Plan. To the extent Defendants had a process in place, it was imprudent and ineffective given the objectively unreasonable level of fees the Plan paid for recordkeeping and administrative services. Had Defendants appropriately monitored the compensation paid to USICG and ensured that participants were only charged reasonable recordkeeping fees, Plan participants would not have lost millions of dollars in their retirement savings over the last six-plus years.

## VIII.   CLASS ACTION ALLEGATIONS

140.    Pursuant to 29 U.S.C. § 1132(a)(2), ERISA authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a).

141.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as the representative of, the following class (the "Class"):

> All participants in and beneficiaries to the USI 401(k) Plan from March 26, 2015, through the date of judgment (the "Class Period").

142.    Excluded from the Class are Defendants and any Plan fiduciaries. Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

143.    This action meets the requirements of Rule 23 of the Federal Rules of Civil Procedure and is certifiable as a class action for the following reasons:

144.    **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time because such information is in the sole possession of Defendants and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that many thousands of persons comprise the Class. Per Form 5500 filed with the DOL for the Plan year ending December 31, 2019, the Class includes at least 9,867 individual current Plan participants.

145.    **Existence and Predominance of Common Questions of Law and Fact:** Common questions of law and fact exist as to all members of the Class because Defendants owed fiduciary duties to the Plan and to all Plan participants and beneficiaries, and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a.  whether the fiduciaries are liable for the remedies provided by 29 U.S.C. § 1109(a);

b.  whether Defendants were fiduciaries to the Plan under ERISA;

c.  whether Defendants breached fiduciary duties to the Plan in violation of ERISA;

d.  whether the Plan and Plan participants are entitled to damages or monetary relief as a result of Defendants' breaches of fiduciary duties;

e.  if so, the amount of damages or monetary relief that should be provided to the Plan and its participants;

f.  what Plan-wide equitable and other relief the Court should impose in light of Defendants' breaches; and

g.  whether the Plan and its participants are entitled to any other relief as a result of Defendants' breaches and conduct alleged herein.

146.   Given that Defendants have engaged in a common course of conduct as to Plaintiff and the Class, similar or identical injuries and violations are involved, and common questions far outweigh any potential individual questions.

147.   **Typicality**: All of Plaintiff's claims are typical of the claims of the Class because Plaintiff was, and is, a Plan participant during the Class Period and all Plan participants were harmed by the uniform acts and conduct of Defendants discussed herein. Plaintiff, all Class members, and the Plan sustained monetary and economic injuries including, but not limited to, ascertainable losses in retirement income and retirement account value, arising out of Defendants' breaches of their fiduciary duties to the Plan.

148.   **Adequacy:** Plaintiff is an adequate representative for the Class because Plaintiff's interests do not conflict with the interests of the Class that she seeks to represent; Plaintiff was a Plan participant during the Class Period and continues to participate in the Plan; and Plaintiff is committed to vigorously representing the Class. Plaintiff has retained counsel who are competent

and highly experienced in complex class action litigation – including ERISA and other complex financial class actions – and counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and Plaintiff's counsel.

149.    **Superiority:** A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small, and it would be impracticable for individual members to enforce their rights through individual actions. Even if Class members could afford individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, the records (including databases, e-mails, etc.) that Defendants maintain regarding the Plan. Given the nature of the allegations, no Class member has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action.

150.    Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

## IX.   <u>CAUSES OF ACTION</u>

### <u>COUNT I</u>
**Breach of Duty of Prudence Under ERISA:**
**Imprudent and Unreasonable RPS Fees**
**(Plaintiff, individually and on behalf of the Class)**

151.    Plaintiff incorporates the above allegations as if fully set forth herein.

152.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

153.    29 U.S.C. § 1104 imposes fiduciary duties of prudence upon Defendants in their administration of the Plan.

154.    Defendants, as fiduciaries of the Plan, are responsible for selecting an RPS provider that charges reasonable retirement plan service fees.

155.    During the Class Period, Defendants had a fiduciary duty to do all of the following:

> a.    ensure that the Plan's retirement plan service fees were reasonable;
>
> b.    manage the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries;
>
> c.    defray reasonable expenses of administering the Plan; and
>
> d.    act with the care, skill, diligence, and prudence required by ERISA.

156.    During the Class Period, Defendants had a continuing duty to regularly monitor and evaluate the Plan's RPS provider to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding recordkeeping services and the significant bargaining power the Plan had to negotiate the best fees.

157.    During the Class Period, Defendants breached their fiduciary duty of prudence to Plan participants, including Plaintiff, by:

> a.    Allowing the Plan to pay multiples of the reasonable per-participant amount for the Plan's retirement plan service fees;

b.     Failing to properly disclose the fees charged to Plan participants in their quarterly statements or fee disclosures;

c.     Failing to defray reasonable expenses of administering the Plan; and

d.     Failing to act with the care, skill, diligence, and prudence required by ERISA.

158.    During the Class Period, Defendants breached their duty to Plan participants, including Plaintiff, by failing to employ or follow a prudent process to critically or objectively evaluate the cost and performance of the Plan's RPS provider in comparison to other RPS options, as evidenced by their failures to conduct an RFP, properly benchmark the Plan's RPS fees, or leverage the Plan's size to obtain lower fees.

159.    Through these actions and omissions, Defendants breached their fiduciary duties of prudence with respect to the Plan in violation of 29 U.S.C. § 1104(a)(1)(A).

160.    Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of a like character and with like aims, thus breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

161.    As a result of Defendants' breaches of fiduciary duties, Plaintiff and Plan participants suffered objectively unreasonable and unnecessary monetary losses.

162.    Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3).

<u>COUNT II</u>
**Breach of Duty of Loyalty Under ERISA:**
**Imprudent and Unreasonable RPS Fees**
**(Plaintiff, individually and on behalf of the Class)**

163.    Plaintiff incorporates the above allegations as if fully set forth herein.

164.    Defendants, as fiduciaries of the Plan, are responsible for selecting RPS providers that charge reasonable fees, including for recordkeeping services.

165.    In selecting RPS providers, Defendants owed a duty of loyalty to Plaintiff and Plan participants to act solely in their interests and for their exclusive benefit.

166.    During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's RPS provider to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding recordkeeping services and the significant bargaining power the Plan had to negotiate the best fees.

167.    During the Class Period, Defendants breached their fiduciary duty of loyalty to Plan participants, including Plaintiff, by:

        a.    Employing its wholly-owned subsidiary, USICG, as the Plan RPS provider;

        b.    Charging the Plan higher fees to subsidize the lower fees paid to USICG by its other defined contribution plan RPS clients.

        c.    Allowing the Plan to pay USICG multiples of the reasonable per-participant amount for the Plan's RPS fees, which ultimately inured to the benefit of the Plan sponsor;

        d.    Failing to defray reasonable expenses of administering the Plan; and

        e.    Allowing the Plan to maintain USICG as the Plan's RPS provider despite the unreasonable level of fees being charged by USICG for those services, which inured to the benefit of Defendant USI to the detriment of the Plan participants.

168.     During the Class Period, Defendants breached their duty of loyalty to Plan participants, including Plaintiff, by failing to remove USICG as the Plan's RPS provider when it was apparent that (a) the fees charged by USICG were excessive in comparison to other recordkeeping options and (b) the only reason USICG was maintained as the Plan's RPS provider, despite charging excessive fees for its services, is that it is the consulting arm of Defendant USI.

169.     Through these actions and omissions, Defendants breached their fiduciary duties of loyalty with respect to the Plan in violation of 29 U.S.C. § 1104(a)(1)(A).

170.     As a result of Defendants' breach of fiduciary duties, Plaintiff and Plan participants suffered objectively unreasonable and unnecessary monetary losses.

171.     Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3).

<u>**COUNT III**</u>
**Failure to Adequately Monitor Other Fiduciaries Under ERISA:**
**Imprudent and Unreasonable RPS Fees**
**(Plaintiff, individually and on behalf of the Class)**

172.     Plaintiff incorporates the above allegations as if fully set forth herein.

173.     Defendants had the authority to appoint and remove individuals responsible for retirement plan service fees for the Plan and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

174.     In light of this authority, Defendants had a duty to monitor those individuals responsible for overseeing retirement plan service fees for the Plan to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to

protect the Plan in the event that these individuals were not fulfilling those duties.

175.    Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to perform their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analyses respecting Plan decisions; and reported regularly to Defendants.

176.    Defendants breached their fiduciary duties by, among other things:

    a.    Failing to monitor and evaluate the performance of individuals responsible for retirement plan service fees for the Plan, or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high retirement plan service fee expenses;

    b.    Failing to monitor the process by which the Plan RPS provider was evaluated and failing to investigate the availability of lower-cost RPS providers;

    c.    Failing to remove individuals responsible for RPS fees for the Plan whose performance was inadequate in that these individuals continued to pay the same RPS fees even though benchmarking and using other similar comparators would have shown that maintaining USICG as the RPS provider altogether or at the current level of fees paid to it was imprudent and excessively costly, all to the detriment of the Plan and Plan participants' retirement savings;

    d.    Failing to monitor the process by which the Plan investigated the availability of lower-cost share classes of certain mutual funds in the Plan; and

    e.    Failing to remove individuals responsible for excessive mutual fund operating expenses for the Plan whose performance was inadequate in that these individuals continued to offer the same higher-cost share classes even though a review of the fund prospectus would have shown that lower-cost share classes were available, and that maintaining the Plan investment options in the current share classes was imprudent and excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

177.    As consequences of the foregoing fiduciary breaches, Plaintiff and Plan participants suffered unreasonable and unnecessary monetary losses.

178.     Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor individuals responsible for retirement plan service fees for the Plan. In addition, Plaintiff is entitled to equitable relief and other appropriate relief.

## X.     PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and request that the Court award the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

C.     A declaration stating that Defendants have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from the failure to properly monitor and control RPS fees, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

F.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

G.     An award of pre-judgment interest;

H.     An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.     Such other and further relief as the Court deems equitable and just.

Dated: May 20, 2022                    By: */s/ Paul R. Wood*
                                       Paul R. Wood (*pro hac vice*)
                                       Franklin D. Azar (*pro hac vice*)
                                       Timothy L. Foster (S.D.N.Y. #TF8896)
                                       Margeaux R. Azar (*pro hac vice*)
                                       FRANKLIN D. AZAR & ASSOCIATES, P.C.
                                       14426 East Evans Avenue
                                       Aurora, CO 80014
                                       Telephone: (303) 757-3300
                                       Fax: (720) 213-5131
                                       *woodp@fdazar.com*
                                       *azarf@fdazar.com*
                                       *fostert@fdazar.com*
                                       *azarm@fdazar.com*

                                       Steven A. Schwartz (*pro hac vice*)
                                       Beena McDonald (*pro hac vice*)
                                       CHIMICLES SCHWARTZ KRINER
                                         & DONALDSON-SMITH LLP
                                       361 W. Lancaster Avenue
                                       Haverford, PA 19041
                                       Tel: (610) 642-8500
                                       Fax: 610-649-3633
                                       *sas@chimicles.com*
                                       *bmm@chimicles.com*

                                       *Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I, Paul R. Wood, hereby certify that on May 20, 2022, I authorized the electronic filing of the foregoing, AMENDED COMPLAINT – CLASS ACTION, using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List maintained by this Court.

<u>/s/ Paul R. Wood</u>
Attorney for Plaintiff